1823.

BACON
v.
BRONSON.

BACON *against* BRONSON and others.

Application was made by the plaintiff, who resided out of the State, to *R.*, an attorney here, to draw a bond and mortgage from *B.* to the plaintiff. The attorney lived near the mortgaged premises, and was well acquainted with the property, and the circumstances of *B.*; and on being asked, at the time, if he knew of any incumbrances on the land, answered, that he did not know of any, except a judgment in favour of *A.*, though he knew that there was a prior mortgage to the Loan Office of the State, under which the premises were afterwards sold, unknown to the plaintiff, and *R.* became the purchaser for less than one third of their value: *Held*, that the representation made by *R.* being false, and the purchase by him under the prior incumbrance fraudulent, he was responsible to the plaintiff for all damage or loss sustained by him in consequence of such fraud. And the premises, in the first instance, were ordered to be sold, subject to prior incumbrances, to pay the plaintiff's debt, with interest and costs, and *R.* was decreed to pay any deficiency.

*May 17th.*     BILL, filed *February* 16, 1821, stated, that the defendant, *Bronson*, on the 11th of *June*, 1818, executed a bond and mortgage to the plaintiff, to secure the payment of 500 dollars and 76 cents, with interest, on the 1st of *December*, 1819. The mortgage was of a farm of 175 acres, in *Amsterdam*, in *Montgomery* county, and was recorded on the day of its date. The defendant, *Reynolds*, an attorney, residing in *Amsterdam*, prepared the bond and mortgage, and witnessed their execution. The defendant, *B.*, when he gave the mortgage, declared that the premises were unincumbered, except by a judgment, entered up by *R.*, as attorney, in favour of *Benedict Arnold*; and the plaintiff's agent, by whom the bond and mortgage were taken, examined the records, and was informed that there was no mortgage or other incumbrance on the land. Both the plaintiff and his agent resided in the state of *Connecticut*,

and were uninformed of any public 'loan office in the county, and of the necessity of looking there for any incumbrance. That the plaintiff never knew, or suspected, that there was any prior incumbrance to defeat his security, until *December*, 1820, when he heard, for the first time, that the premises had been sold, on the *third* Tuesday of *September*, 1820, under a mortgage to the loan office commissioners, for securing the payment of 750 dollars, for default in payment of the interest, and that the defendant, *R.*, had purchased the land. That *R.*, on being applied to by the plaintiff's agent, said, that his claims were about 1700 dollars, part of which was on his own account, and the residue belonged to clients for whom he had judgments against *B.*; and that, upon payment of that sum, he would convey the premises to the plaintiff, reserving the residue of the real estate not covered by the mortgage, provided that the defendant, *B.*, would consent; and that the plaintiff must pay the 1700 dollars, and also the 750 dollars due to the State. That the plaintiff's agent, on the 10th of *February*, 1821, called on *R.*, for the purpose of paying these demands, and receiving a deed for the 175 acres, but *R.* refused to act, saying, he had bound himself to give a deed to the defendant, *Marshall*; and that *George*, a son of the defendant, *B.*, had a right to redeem within ten years, by a private agreement between *M.* and the family of *B.* That *R.* also said, that the whole property purchased by him was worth 14,000 dollars, and the 175 acres, 7000 dollars, in cash; that the defendant, *B.*, had always valued the farm at 10,000 dollars. The bill charged that *R.* was attempting to defeat the remedy of the plaintiff under his mortgage, and making innocent purchasers under *B.* pay large sums of money to redeem their lands, &c. That *R.* was a practising attorney at *A.*, living within two miles of the premises, and knew the condition of the estate, real and personal, of *B.*, &c. That there was a fraudulent combination between the defendants,

*B.* and *R.*, to let the premises be sold to pay 52 dollars and 50 cents, interest due on the mortgage to the loan officers, so as to defeat the plaintiff's security, and to enable *R.* to oppress innocent purchasers, &c. *Prayer,* that the plaintiff may be allowed to redeem, on paying 750 dollars, and interest, and all prior incumbrances, &c. ; that the sale under the loan office mortgage may be declared void, as against the plaintiff; and that the defendants, *R.* and *M.*, be decreed to release to the plaintiff the 175 acres, &c. and for general relief. On the 15th of *April,* 1822, the plaintiff filed a supplemental bill against two of the children of *Bronson,* stating the original bill, to which the defendants, *R.* and *M.*, had answered, but not *B. ;* and that *R.*, on the 27th of *January,* 1821, executed a quit claim deed to *M.* for the 175 acres, for the consideration of 1000 dollars ; and that *M.* executed to the defendants, the two children of *B.*, a contract, to convey to them the 175 acres, on payment of 1500 dollars, by yearly instalments ; which contract the plaintiff alleged to be fraudulent, and with a view to defeat the plaintiff's mortgage, &c. &c. The plaintiff prayed, that these two defendants might be decreed to convey all their right to the plaintiff, and to deliver up all the deeds and contracts, &c.

The defendant, *R.*, in his answer, admitted that he drew the bond and mortgage from *B.* to the plaintiff; that he had before that time heard of the loan office mortgage, and believed that there was such a mortgage ; that he did not mention it to the agent of the plaintiff when the bond and mortgage were executed. That about the 20th of *January,* 1821, he told the plaintiff's agent, that the farm had been sold for non-payment of interest on the loan office mortgage, and that he had purchased it, and had offered to reconvey to *B.* all that part which was in his possession, on payment of 1700 dollars ; and that he would convey it to the plaintiff on the same terms. That the plaintiff's agent

afterwards called on him to pay the money, and take a deed for the 175 acres, when he, *R.*, told him, that since he before called, he had made a disposition of the property to the defendant, *M.*, so that it was out of his power to convey it to the plaintiff, &c. That on the 27th of *January*, 1821, he conveyed the 175 acres, by a quit claim deed, to *M.*, who paid him 800 dollars, and gave his note for 200 dollars; and that *M.*, on the same day, executed a contract to convey the land to the two defendants, children of *B.*, for 1500 dollars, payable in annual instalments. He admitted that he told the plaintiff's agent, that the defendant, *B.*, had, until after the sale under the loan office mortgage, a personal estate of the value of 1500 dollars, &c. That *Nicholas Bradt* owned two tracts of land in *A.*, which he mortgaged to the loan office commissioners for 750 dollars, on the 14th of *July*, 1792; and the premises, for non-payment of interest, were sold in *September*, 1803, and the defendant, *B.*, became the purchaser, and re-mortgaged the premises for the same sum. That in 1820, *B.* neglected to pay the interest, and the premises became forfeited, and the loan officers absolutely seised thereof by the statute; and they sold the premises at auction for 1225 dollars. That he gave a mortgage to the loan officers for 750 dollars, and paid them 108 dollars, and gave a receipt to *B.* for the balance, as follows: " *September* 19th, 1820, received of *O. Bronson*, 368 dollars and 38 cents, for which I am to account to him." The defendant claimed an absolute title by the purchase, and denied any secret or express contract, trust, or confidence, between him and *B.*, or any other person, respecting the sale, or that he purchased at the request of *B.*; but that he purchased absolutely, and to promote his own interest. That he knew, when he purchased, that *T. Simons* was in possession of 60 acres, *Jacob Leppen* of 40 acres, *J. T. Leppen* of 40 or 50 acres, and *J. Van Schaick* of 20 or 25 acres; and that the residue, being 175 acres, were in possession of the defendant, *B.*; and that

1823.

BACON
v.
BRONSON.

those persons were *bona fide* purchasers of their respective shares, &c. He admitted that, before the sale, he offered to convey the 175 acres to the defendant, *B.,* for 1700 dollars ; that he knew the situation of the estate of *B.,* who was involved in debt, and was unable, on the day the farm was sold by the loan officers, to pay the interest and costs, and the premises were, therefore, sold. He stated, that the farm was not worth more than 3500 dollars. That the defendant, *B.,* was present at the sale by the loan officers ; and had personal property, but it was not worth more than 1057 dollars ; that he was at that time indebted to this defendant, for debt and costs in certain suits, 837 dollars and 91 cents ; and that the personal property of *B.* was sold on the 25th of *October,* 1820, on an execution issued by the defendant, *R.,* &c.

The defendant, *M.,* also answered.

The bill was taken, *pro confesso,* against the defendants, *B.* and his two children.

Testimony was taken in the cause, the material parts of which are stated in the opinion delivered by the Court.

The cause was brought to a hearing on the pleadings and proofs.

*H. Cunningham,* for the plaintiff.

*D. Cady,* for the defendants.

THE CHANCELLOR. The original and supplemental bills have been taken *pro confesso* against the defendant, *Bronson,* and his two children, *G. W. J.* and *P. Bronson,* and consequently all the charges of collusion and fraud, in the defendant, *B.,* to cheat the plaintiff out of his mortgage security, are admitted. So, it is also admitted, that the defendants, *G.* and *P. Bronson,* possess and enjoy the mortgaged premises, under a contract from the defendant, *Marshall,* in furtherance of the fraudulent views of the de-

fendant, *B.*, and in consummation of that fraud. It is likewise in proof, that the defendant, *Marshall*, took a deed from the defendant, *Reynolds*, with full knowledge of the claim of the plaintiff, and of the allegations of fraud and combination between the defendants, *B.* and *R.*, in the sale and purchase of the land. The only serious point in dispute is, whether the defendant, *R.*, be justly chargeable with fraud, and whether the land, as well as the defendant, *R.*, be responsible to the plaintiff for his debt.

There is one very material fact in the case, which is unquestionably established, and which occurred in the very commencement of the business. It throws light on all the subsequent transactions, and serves to detect the motives and explain the principles which guided the defendant, *R.*

He was a practising attorney in the village of *Amsterdam*, living within the distance of two miles from the mortgaged premises. He had been in the habit of doing business for and against the defendant, *B.*, and was well acquainted with his property, circumstances, embarrassments, and character. He was also well versed in the knowledge of the law of the land, and understood the peculiar force and character of loan office security. The plaintiff and the agent he employed, were *citizens of Connecticut*, strangers to the laws of this state, and ignorant of the existence of any loan office mortgages. In this situation of the parties, the defendant, *R.*, is applied to by the agent of the plaintiff to draw his bond and mortgage. The application was doubtless made to him in his character of an attorney, and the agent inquired of him, if he knew of any incumbrance on the land other than the judgment in favour of *Benedict Arnold*. *R.* replied that he did not know of any other incumbrance, and that he thought the plaintiff would be amply secure in his demand. It is now admitted, by the defendant, *R.*, that he, at that time, knew of the loan office mortgage given by *B.*, for he had frequently heard of it, and believed it to exist. It is proved likewise, that he had

1823.

BACON
v.
BRONSON.

been in the habit of lending money to *B.*, to pay the annual interest upon that mortgage. He admits, also, that he was silent on the subject of that mortgage, and cannot say whether he thought of it at the time he filled up the bond and mortgage to the plaintiff. He does not venture to say that he did not recollect the fact of the existence of the loan office mortgage, though he was particularly interrogated by the bill, whether he did not at the time know of the loan office mortgage, and whether he gave any intimation thereof to the agent of the plaintiff.

The defendant, *R.*, afterwards, availed himself of this very loan office mortgage, to buy in the 175 acres of land covered by the plaintiff's mortgage, as well as upwards of 170 acres of other land, claimed and possessed by several other *bona fide* purchasers. If the purchase by him should be deemed valid, or if he should not be held bound to indemnify the plaintiff, the latter will be deprived of his debt, and the defendant, *R.*, will have made a very profitable, though, at the same time, a very hard and unconscientious speculation, and one producing the entire loss of the plaintiff's security, as well as distress and oppression to the other claimants. He gave only 1225 dollars for his purchase, and he told one of the witnesses that the whole land purchased by him, was worth 14,000 dollars, and the part covered by the plaintiff's mortgage, 7000 dollars. This is supposed to have been a careless and extravagant estimate ; but all the testimony shows that the purchase was most advantageous. *R.*, thus first interferes in this business, by a breach of confidence, and a fraud practised upon the plaintiff, for he makes a false representation to him as to the incumbrances, and one which he knew to be false when he made it, and by means of which he was subsequently enabled to destroy the plaintiff's security, and to make great gain to himself. If the bill had rested the title to relief upon this single fact, the plaintiff would, upon that fact only, have succeeded.

1823.

BACON.
v.
BRONSON.

*It* is a very old head of equity, as Lord *Eldon* observed, in *Evans* v. *Bicknell*, (6 *Vesey*, 174.) that if a representation be made to another person, going to deal in a matter of interest, upon the faith of that representation, the former shall make that representation good, if he knew that representation to be false. He held, that if there was a jurisdiction at law upon the doctrine, in *Paisley* v. *Freeman*, (3 *Term Rep.* 151.) there was a concurrent jurisdiction in equity; and that case, *upon the principles of many decisions in equity*, might have been maintained here.

There is no dispute about that doctrine. It is a principle of universal law. Fraud and damage, coupled together, will entitle the injured party to relief in any Court of justice.

It would not have excused the defendant, *R.*, if he had said that he did not recollect the loan office mortgage; *but he does not say so;* and the conclusion is, that he did recollect it, and intentionally concealed the knowledge of it, with a view of maturing the scheme of fraud, which he afterwards successfully practised. In *Burrows* v. *Lock*, (10 *Vesey*, 470.) it was held by the Master of the Rolls, that such a demand for damages, for a misrepresentation of a fact, was properly made in equity. The defendant, in that case, admitted he had received information of a fact inquired after, and did not at the time recollect it; but the judge set aside the objection of a want of recollection as wholly unsound. The plaintiff there was going to deal with *C.* upon a matter of interest, and he applied to the defendant to know what *C.* was entitled to, and he told him expressly that *C.* had an undoubted right to make an assignment to such an extent, knowing that he had not a right to make such an assignment. " What can the plaintiff do," said Sir *Wm. Grant*, " to make out a case of this kind, but show, 1. that the fact as represented is false; 2. that the person making the representation had the knowledge of a fact contrary to it. The plaintiff cannot dive

If one person represents to another, going to deal in a matter of interest, on the faith of the representation, the former, if he knew that representation to be false, shall make it good.
Fraud and damage, coupled together, entitle the party injured to relief in a court of justice.

1823.

BACON
v.
BRONSON.

into the secret recesses of the heart, so as to know whether he did or did not recollect the fact, and it is no excuse to say he did not recollect it.     At least, it was gross negligence to take upon him to aver positively and distinctly that *C.* was entitled to the whole fund, without giving himself the trouble to recollect, whether the fact was so or not ; without thinking upon the subject." The Master of the Rolls, therefore, held the defendant responsible to the purchaser for the damages resulting from the misrepresentation.

A party is responsible in equity, for damages resulting from his wilfully false assertion.

If, then, the case had stood upon the fact, that the defendant *R.* had been applied to by the plaintiff, while employed professionally on the very business to which the inquiry related, for information as to his knowledge of incumbrances, and he had declared there was no other incumbrance than the judgment, though he then knew of the loan office mortgage, we have seen that he would have been responsible to the extent of the plaintiff's damage, for such a wilfully false assertion.    But the bill does not place the title to relief precisely upon that point, but makes the fraud of the defendant, *R.*, in the subsequent purchase, the ground for relief; and though specific as well as general relief be prayed for, any relief may be afforded which is consistent with the case made by the bill.    The previous deception, then, in this case, is a pretty sure test of the motives of the defendant, *R.*, throughout the subsequent stages of the business, and is weighty as auxiliary proof of fraud deducible from the facts attending the purchase.

The next circumstance to show a meditated fraud upon the plaintiff is, the proposition of the defendant, *R.*, to *Arnold*, the winter previous to the sale, when he contemplated that the lands of *B.* would be sold, and that he and *Arnold* should become purchasers.  This intention will rationally account for his determination, about the time of the sale, to refuse the pecuniary aid he had been accustomed to lend to *B.*, to discharge his annual interest upon the loan

office mortgage. The defendant, *R.*, pretended to be apprehensive of his debt, and certainly he had no reasonable ground for that apprehension. The defendant, *B.*, was in possession of personal property, worth from 1500 dollars to 2500 dollars, and the defendant, *R.*, had the control of judgments and executions, for debts, including his own, and little less in the whole than 900 dollars, before the sale of the land. The personal property was all sold a few weeks after the loan office sale, and bought in chiefly by the defendant, *R.*, at less than half its value. He had, also, at the sale of the farm, given to the defendant, *B.*, a receipt for the surplus moneys, amounting to 368 dollars and 38 cents, and these surplus monies he was permitted by *B.* to retain, without requiring or receiving any credit for it, on the judgments and executions under the control of *R.* This fact occurred on the day of the sale of the real estate, and it is demonstrable proof of the confidential manner in which the parties dealt with each other, even on such a trying occasion as the purchase by the one, and the voluntary sacrifice by the other, of a large estate. The defendant, *R.*, avowed, just before the sale, that he was going to make a speculation; and it appears, from the testimony of *Arnold*, that *B.* and *R.* had made some previous arrangements, probably at the time of the sale, which *R.* was called upon to fulfil, and the nature of which is not precisely disclosed, though the fact of some arrangement was admitted. It is quite apparent, from the whole view of the facts, that *B.* and *R.* acted in friendly concert with each other, at the day of sale. Their mutual conduct was conclusive evidence of a very amicable understanding of each other's views. *B.* made no real efforts to raise the small amount of 52 dollars and 50 cents, and prevent the sale. It is to be inferred that he had *Canadian* bills sufficient for the purpose, which he might have exchanged at a small discount; but he was unwilling to give a discount, though so great an interest was at stake. *R.* avows that he made the purchase to pro-

mote his own interest, and that of his friends, or, as he says in another place, to secure some judgments he had in his office, and his own demands. After the sale, he freely promised to pay *Arnold's* judgment, to which he was the attorney; and he said he did not want the farm, if *B.* and his friends could make an arrangement with him. How is it possible to avoid the inference, that the sale was made with the consent or acquiescence of *B.*, and with concerted views? and those views are admitted by *B.* to have been fraudulent.

It is another important ingredient in the case, that *B.* and his family have been suffered, ever since, quietly to possess and enjoy the real and personal estate. Indeed, the amazing fact that *B.* should stand by on the day of sale, and tamely suffer, without a single serious effort to prevent it, a farm of 175 acres, and worth six thousand dollars, to be sold absolutely, to raise the paltry sum of 52 dollars and 50 cents, and should, throughout the events of that day, and in all the subsequent transactions, be upon the most friendly terms with *R.*, the purchaser, and his former patron, and that they should afford each other every accommodation and facility, is, to my mind, overwhelming proof of collusion and combination to defraud creditors. And considering the imposition practised upon the plaintiff, both by *B.* and *R.*, when the mortgage was taken, how can we avoid the conclusion, that he was the premeditated victim from the beginning?

The only real question that remains, after stating the facts in the case, is, as to the nature and extent of the relief. If the plaintiff was to be permitted to lose his debt upon such a state of things, and without any remedy, either against the land or against *R.*, it would appear to me to cast a shade over the administration of justice.

The land ought to be held answerable for the mortgage debt, subject to the loan office mortgage; and also, to *Arnold's* judgment, if it be not already discharged, according

to the promise of *R.* And though it be a rule of practice to require all incumbrancers to be brought in as parties, I think that in this peculiar case, it would be entirely unnecessary to have the cause stand over for that purpose. The land might easily, and safely, and without any kind of inconvenience, be applied to the payment of the plaintiff's debt, subject to those incumbrances.

The defendant, *R.*, ought, also, to be held personally responsible to the plaintiff for the loss of his mortgage security, if that security was to be deemed impaired or lost, by reason of his fraud. He has remortgaged the 175 acres to the loan office, and subject to that mortgage, he has sold the land to the defendant, *M.*, for 1000 dollars. He has, therefore, received more money from the purchase, than would be sufficient to satisfy the debt due to the plaintiff, and, in justice, he ought to be required to satisfy it.

The defendant, *M.*, was a purchaser from *R.*, with notice of the equities of the plaintiff; and all the fraudulent circumstances connected with the purchase by *R.* The mortgaged premises claimed, or possessed, by the defendants, *M.*, or *B.*, or by his children, *G.* and *P. Bronson*, therefore, remain chargeable in equity with the lien of the plaintiff's mortgage, subject to the loan office mortgage mentioned in the pleadings. That mortgage was taken in good faith, and without knowledge of any fraud, to affect the title of *R.* It ought, also, to be charged with the lien, subject to any prior incumbrance, if any there be, that is valid and subsisting; though none is stated, or believed to exist, unless it be the judgment of *Arnold.*

I shall, accordingly, decree a sale of the 175 acres, to satify the debt, interest and costs of this suit, except the costs due from *R.*, and that the same be sold, subject to the incumbrances already stated; and that the defendants, *M., B.,* and *G.* and *P. B.*, release to the purchaser all their right and interest in the same; and that the defendant,

*R.*, pay to the plaintiff that part of his costs properly chargeable against the defendant, *R.*, in respect to his defence; and I shall reserve to the plaintiff liberty to apply to this Court hereafter, on the foot of this decree, for execution against the defendant, *R.*, to raise any deficiency of the plaintiff's debt, interest and costs, not satisfied out of the mortgaged premises.

Decree accordingly.