Judge Caur:
The plaintiff took a deed of trust from Lee, on a quantity of goods, wares and merchandize, to secure certain debts. One of the defendants, Tiernan, a merchant residing in Baltimore, took a subsequent deed for the same goods, got possession, and was proceeding to sell. The plaintiff filed his bill to injoin the sale, and claiming the goods. The Chancellor dismissed the hill, on the ground that Lang’s deed was fraudulent and void as to creditors.
I shall consider; 1st, whether Lang was not liable to Tiernan, for the full amount of his debt, on account of the representation he made to him of Lee’s situation and credit; 2d, whether Lang’s deed was not fraudulent and void.
1. “ Fraud without damage, or damage without fraud, gives no cause of action; hut where these two do concur, there, an action lieth.** Per Croke, J. 3 Bulstr. 95, Upon this ground, it was decided, in Pasley v. Freeman, 3 T. R. 51, that if A. being asked whether B. may he trusted, replies ho is an honest man, and worthy of trust, A. knowing at the same time that B. was unworthy of trust; *418 this renders A. liable for any loss incurred by the party trusting B. in consequence of this false and fraudulent representation. On the same ground stands the case of Eyre v. Dunsford, 1 East. 318, where the defendant being applied to by the plaintiffs, to inform them whether one Thompson, of Hamburgh, might be safely trusted, said, that he did not know any thing of Thompson, but what he had heard from hh correspondent; but that Thompson had a credit lodged with him (the defendant) for 12000/. by a respectable house at Hamburgh; and that he supposed the plaintiff might execute the order (which was for 1000/.) with safety; adding, that this advice was given without prejudice to himself. The plaintiff credited Thompson, on this representation, and he failed. He sued the defendant; and it turned out in evidence, that the credit, which the defendant had represented as unconditional, depended on Thompson’s depositing goods with him, to the amount of 36000/.' Lord Kenyon observed, “When one man applies to another, to know the circumstances of a third, who offers to contract with him, that other need not answer the enquiry at all; but if he do, he is bound in justice and common honesty, to give a fair representation of what he knows. On the contrary, the defendant, when applied to, says, we know nothing of him ourselves, but we have a credit lodged with us by a very respectable house of Hamburgh, for 12000/. which we hold at his disposal. Now, this was grossly false; for the instruction to the defendant was nothing more than this; that when Thompson had lodged goods with him to the amount of 36000/. he was to give him a credit for 12000/. •’’ and the defendant was held liable on his false representation. The next case is Haycraft v. Dunton, 2 East. 92. It grew out of the extraordinary cheat practised on the public, by Miss Robertson, who, by many ingenious devises, so far wrought upon the credulity of her neighbors, as to persuade them that she was a lady of great wealth, greater expectations, and most respectable connexions. Among others, the de *419 fendant, a currier, who lived near the magnificent establish-merit she had set up, was so far duped as to advance her large sums, without taking any security, fie also asserted to the plaintiff, who, being about to deal with her, made enquiries of him as to her credit, that he knew of his own knowledge, that she had a considerable fortune, larger expectations, and might be trusted with perfect safety. After she absconded, the plaintiff sued the defendant on this representation, he having trusted Miss Robertson on the strength of it. The jury found a verdict for the plaintiff, and upon a rule, the Court set it aside, and granted a new trial, (Kenyon dissentiente,) on the ground that there was no fraud; the defendant believing sincerely that the representation he made was true.
In Evans v. Bicknell, 6 Ves. 186, Lord Eldon strongly disapproves of the doctrine of Pasley v. Freeman; and calls it a dangerous doctrine. His chief objection to it seems to be, that it puts it in the power of a single witness, to fix upon a party the debt of another; and this, though the party charged should deny it ever so strongly; whereas, he says, the answer of the defendant in equity would prevail against the evidence of a single witness. But this objec ion is very well answered by Lord Erskine, who, in Clifford v. Brook, 13 Ves. 133, says, “With regard to Pasley v. Freeman, a considerable difference of opinion prevails, and some of the most correct judgments appear to me to have been surprised. My own opinion upon that species of action, does not concur with that of Lord Eldon, as expressed in the case of Evans v. Bicknell; which opinion, I know, his Lordship constantly held in the Court of Common Pleas. The mistake of those who invade the principle of that action, consists in this; the proposition is not that if a man asked whether a third person may be trusted, answers, ‘ you may trust him, he is a very honest man, and worthy of trust,’ an action will lie, if ho proves otherwise. There must be, the knowledge at the time. That is the sound principle; that the defendant knowing *420 that person dishonest, insolvent and unwoi’thy of trust, mac]e t,he representation, and that is the subject of an action, &e. As to the danger from a single witness, is not that sufficient for conviction of a capital crime ? That objection goes to the very root of the law; which is uniform in principle and practice, with the single exception of perjury, as there is oath against oath. The case of Pasley v. Freeman, therefore, stands upon the clearest principles of jurisprudence, and has no .connexion with the statute of frauds, which applies where one man undertakes for the debt of another.” In Benson v. Bronson, 7 Johns. Ch. Rep. 202, Chancellor Kent, speaking of Pasley v. Freeman, says, “.There is no dispute about that doctrine. It is a principle of universal law. Fraud and damage, coupled together, will entitle the injured party to relief, in any Court of Justice.”
Thus stands the doctrine of Pasley v. Freeman, and restricted as it is, to cases of fraud and consequent dámage, I think it sound and wholesome law.
Let us examine whether the case before us, be within its influence. Lee and Lang lived in the same village; Lang, a man well established in business and character, well known in Baltimore as a merchant; Lee, a young man, entirely unknown in Baltimore, and incumbered by a debt to Lang, greater than his property would discharge. They travel together to Baltimore, for the purpose of getting goods on credit; Lee taking with him no letters of credit or introduction, that we hear of. What must have been his dependence? What the understanding and arrangement between himself and Lang before they set out ? Why, that Lang should introduce Lee to the merchants, in such a way, as to. procure for him a credit. This, it will be observed, is not the case of a person applied to for the character of another, and speaking in answer to that application. The enquirer in such case is'the actor, the person interested; the respondent merely passive. ■ He discharges the duty of common civility only, in replying *421 to the question; and as there is nothing to expose him to the suspicion of a preconcerted design, to procure credit for the third person, his words should not be construed strongly against him. But here, the merchants did not come to Lang to make enquiries. He sought them, for the purpose of introducing Lee, and obtaining a credit for him. He brought Lee too, from a place so distant, that the merchants had no means of applying to others, for his character, and were compelled to act on Lang’s representation solely. These considerations, added to the important fact that Lee was his debtor, shew the peculiarly delicate and responsible situation, in which Lang had placed himself. With these facts in mind, let us look to the evidence.
The defendants expressly state in their answer, that Lang introduced £ee to them, as a man worthy of credit, and that they trusted him in consequence of that representation. Morgan says, that Lang introduced Lee to Tier-nan, as a young man of integrity; and as such, entitled to credit. Baughan says, that Lang introduced Lee to him, and that in consequence of the generally good character he gave him, he had the fullest confidence in his ability to meet any engagement he might make; and he knows that by the strong recommendations of Lang, he was enabled to make considerable purchases in Baltimore. Gray says Lang introduced Lee to him as a responsible man; which induced the deponent to credit him for what groceries he wanted. Lee, himself, (in his deposition) says, that he was a stranger in Baltimore, and that by Lang’s introduction and recommendation, he was enabled to purchase to the amount of $ 2500 worth of goods. Now, I do not care in what set form of words, these recommendations were made. The clear intention was to obtain a credit for Lee, and the effect was produced. Was the representation a fair one ? Did it place before the merchants, truly, the real situation of Lee; so that, seeing both sides of the question, they might be enabled to judge, whether they could safely *422 trust him ? On the contrary, his conduct was, to my mind, Srossly fraudulent. Here is a creditor taking his debtor to a foreign market, where he is well known, the debtor a stranger; introducing him as a man worthy of credit; yet carefully concealing the relation in which they stood,—the vital fact, that he was deeply indebted to him. Suppose he had told the truth;—had said, “here is a young man, of whom I have a good opinion. I believe him honest, and should be pleased to see him succeed in getting goods; but I feel bound, in common honesty, to disclose the fact, that he is indebted to me, more than he is worth.” Can any man believe, that the merchants would have trusted him ? No ! Why was not this fact stated ? Not because it was forgotten. That was impossible; for the very representation he was making, must have brought it distinctly before him. Why not state it ? Because he knew it would defeat his purpose, and therefore, fraudulently withheld it. If conduct like this be tolerated, see what a temptation it holds out to creditors, to gain for their debtor a fictitious credit, by which he might be enabled to pay their debt. They have only to take him to a strange place, introduce him as a man worthy of credit, obtain goods for him, and convert them to their own purposes; leaving those whom they had deluded, to bear the loss. How was it in this case ? Soon after their return, Lang got $ 500 worth of the goods; and afterwards took a deed of trust upon the whole. Upon the first point, then, I am clear, that Lang’s representation was wilfully and fraudulently false; and that he was liable to Tiernan, in case of Lee’s insolvency.
2. Let us now examine the deed. The sums of money which it was taken to secure, are left blank; and this, not from ignorance or mistake, but as the trustee tells us, because the parties had not, when the deed was executed, fixed on the sum due from Lee, or those for which Lang was his surety; and this important desideratum was furnished afterwards, not by the creditor, but the debtor, in the following loose note to the trustee. “Mr. Browne, *423 Sir, The amount of the trust, say $5150,” signed “ W'm. Lee;” a mere conjectural balance, “say $5150,” fur-wished too, by the debtor. Look now at the description of the goods. “All the entire stock of goods in the possession of the said Lee, in his store, in the city of Williamsburg.” No inventory, no invoice, no list. Does this look like a real bona fide transaction ? But the worst is to come. The deed was executed in March, 1819. In the July following, he was to pay one-third of the debt; in November, another third; and in January, 1820, the residue; giving him nearly a year for the whole; and in the moan time “ it is covenanted and agreed,” (says the deed) “ that the said goods are to remain in said Lee’s possession, and he is empowered to make sales of them,” but is to account with the trustee, if called on. Now I ask, what possible security could the deed furnish, incumbered with a stipulation like this? Is it not completely a felo de se? A security is taken on goods, and they are left in the possession of the debtor for ten months, with a power to sell and dispose of them, as he may think proper; no check whatever; for the clause about accounting, relates only to the money, for which he has sold the goods. Does not this resolve the whole matter into personal security? And is the debtor more bound to account for the money, than he was before, for the debt? It is said he was trusted as factor. But where is the evidence of this ? The transaction is not marked with a single feature of factorage. There are no terms, no salary, no per centage for collection. How was Lee to live, while doing this business? No doubt, on the proceeds of the goods; and this, without stint or limit. Suppose he had sold every article in the store, the next day. Could Lang call back the goods? Certainly not; for he had given Lee express power to sell. As a security then, this deed was nought. What other possible purpose could it have, than to “ delay, hinder or defraud” the creditors of Lee? The reason of Edwards v. Harben; Hamilton v. Russell, &c. applies strongly to this case. *424 Possession in the vendor, after an absolute deed, is frauduient, because it is incompatible with the avowed purpose of the deed. So here, the possession and power of sale are fraudulent, because it is incompatible with the avowed purpose of the deed. In Lavender v. Blackstone, 2 Lev. 146; 3 Keeb. 526, it was held by the King’s Bench, that a conveyance by an insolvent debtor in trust to pay debts, was fraudulent, because, among other things, it had a proviso enabling the grantor to make leases for any term, without rent; and this was considered as putting it in his power to defeat the whole settlement. For though the consent of the trustees was necessary, yet they were trustees of his own nomination. In Tarbeck v. Menbury, 2 Vern. 510, the defendant made a conveyance of his estate to trustees, to the use of himself for life, and with power to mortgage the same, remainder to trustees to sell and pay .his debts. The keeper held the deed fraudulent, because the defendant having reserved to himself a power to mortgage, and charge the estate with what sums he thought fit, he might have charged it to the full value, which amounted, in effect, to a power of revocation, and rendered it fraudulent against creditors. In these cases, we find it explicitly laid down, that a power retained by the grantor, enabling him to defeat the provisions of the deed, renders it fraudulent and void. In Riggs v. Murray, 2 Johns. Ch. Rep. 565, the Chancellor, speaking of a deed with a power of revocation, says, “The necessary inference seems to be, that it was made to delay, hinder, or defraud, creditors. Family settlements may often require such powers of revocation, to meet the ever varying interests of family connexions; but it is difficult to perceive a proper motive in a debtor, who means nothing more nor less than the payment of a debt, to reserve in the very instrument of assignment, a right to recall the payment. The only effect of such an assignment, is to mask the property. If tolerated, it would become an inlet to fraud, and lead |o all imaginable abuse.” “The law is so jealous on this sub *425 ject, that if a deed contains a power in any way equivalent in its effects, to a power of revocation, it is fatal.” I know that the case, from which I quote these extracts, was reversed. But I do not understand it to have been on this point; and the extracts seem merely a declaration of the settled law on the subject. All the cases concur in the position, that if the power retained, enable the grantor to defeat the provisions in the deed, it is null and void; and this, upon the known principles of the common law, of which, the statutes on the subject of fraud, are merely declaratory.
Now, can we imagine a power more completely adequate to the destruction of the avowed purpose of the deed, than that retained by the grantor in this case? The goods, the identical articles of merchandize, constituted the sole security provided by the deed, for the payment of the debts; and yet the debtor, while affecting to devote the goods to that purpose, retains the possession, the use, the power of selling every article, to whom, in what manner, and on what terms he plea'ses. He is to account though, if called on. But is this more than a personal accountability ? The goods are gone. You cannot follow them. The money received for them has no ear mark. You cannot follow it, though the grantor pay it away the moment after he receives it, in satisfaction of his own debt. What are you, then, after all, but a general creditor? To this purpose, the case of Ryall v. Roll, 1 Atk. 165, is very strong. That, it is true, was a case under the bankrupt acts, and they are particularly strong and high toned on these subjects; especially 21 James 1. Yet the quotations I shall make, do not seem so much founded on them, as deduced from the principles of the common law. Justice Burnet said, “ if this were the case of a pawn, there might be some doubt; the pawn is complete by the delivery. But on a conditional or absolute sale, the sale is complete by the contract, and the party is entitled to a delivery of the goods, as soon as he has paid the price. If, therefore, *426 a conditional vendee pays money, and does not insist on a delivery of the goods, he confides in the credit of the ven« dor, and not in any real or particular security; and ought to come in under the commission, as much as any other person that places a confidence in the bankrupt, and not in any other security.” In the same case, Lord Hardioicke says, “where the vendee leaves the goods bought, in possession of the bankrupt, he confides as much in his general credit, as that creditor who has taken only a bond or note. In such cases, tho bankrupt had it in his power to sell all the goods the next hour; and the vendee or assignee could not claim them from the buyer, but could only have a personal remedy ágainst the bank" rupt.” There is another case, the principles of which, I think, strongly apply to this. It is Bamford v. Barron, 2 T. R. 594, in the note. The sheriff had taken goods on an execution against Hays. The defendant seized them, as having the legal title. The sheriff discharged the execution, and brought trover for the goods. The defendants claimed as trustees, under an assignment made by Hays, the debtor, dated 16th August, 1786, (prior to the execution,) for the benefit of such of his creditors, as would sign a deed of compromise, in a given time; notice whereof had been published in the country papers. The answer of the plaintiff to this was, that it was agreed that Hays should continue in possession, till May, 1787; he accounting for the profits to the parties; that he accordingly continued in the visible possession of the goods, after the assignment, and therefore, the transfer was void. To this, the defendants replied, by shewing an undertaking of Hays, to account to the trustees for all the profits of the trade, from the date of the assignment. The plaintiff contended, that neither that undertaking, nor the notice in the papers, was sufficient to shew the change of property; and, therefore, the transfer was void, by the assignor’s continuing in possession. The King’s Bench, after argument before them, unanimously agreed, that the assignment was *427 fraudulent and void. Compare the cases. Here Lee continued in possession, precisely as before, selling the goods, the visible owner to all the world; and though there was a deed, that in fact gave no notice; for it was held up, and never committed to record, till upwards of seven months after the transaction, and the day before the plaintiff commenced this suit; and though this holding up does not, of itself, constitute fraud, (as the deed was recorded within eight months,) yet, where there are so many other badges of fraud, it has some weight in fixing the character of the transaction. It aided considerably the purpose of presenting Lee to the world, as the owner of the goods. *
My opinion is, that the deed from Lee to Lang was fraudulent and void, as to creditors; and, on both grounds, that the decree of the Chancellor should be affirmed.
Judge Coaltek :
I think the decree in this case may be supported on two grounds.
Lee, a total stranger in Baltimore, accompanies Lang to that city, in the fall of the year 1818, for the purpose of purchasing goods.
In March preceding, he had purchased goods of Lang, and gave his bond for $>2000; the price subject to a credit for 0335 66, for leather returned. This was payable the 1st of May thereafter. In that month, he purchased other goods of Lang, to the amount of $ 1620 69, for which, on the 15th of August, 1818, he gave two obligations, payable on demand, endorsed that they were for goods purchased in May preceding. These goods had been badly laid in, as well as to selection, as prices; and would, therefore, not *428 command the money for which they were sold. It does not appear, that Lee owned any other property, except a moiety of the schooner Funny. He was then indebted to Lang in these several sums, when they went to Baltimore. Lang was well known there as a merchant, and introduces Lee in such a way, as to procure him a credit, or credits, to the amount, in all, of about $2500. Was he entitled to such credit, and would Lang have extended it to him himself? I think not. He was then indebted to Lang $3285, which he was unable to pay, as he says, and as Lang- well knew. He had hopes, by getting more goods, and being permitted to trade on them, that his profits would enable him to pay his debts. The subsequent conduct of Lang proves, that he knew that this was his situation; and, at all events, he knew that he owed him a large sum, of which he had paid no part; although it had been due a considerable time. These facts he concealed, when he introduced him. Nay, as I understand, he laid out certain portions of the goods, as for himself, for which Lee alone gave acceptances; and soon after their return, actually received about $500 worth of the goods, thus in fact purchased for himself by Lee, and thus far, and in this way, received payment from Lee, of his debt; and furthermore, (and which shews his knowledge of Lee’s situation, as early as March, 1819,)he procures the deed of trust to be executed to Browne, on which his claim is now founded, for the moiety of the schooner, and the whole of the goods on hand. This, however, would totally have frustrated Lee’s expectations of trading on these goods, and by their profits paying his debts, had not Lang agreed to such terms, as would enable Lee, at least for eight months, to continue his trade, as if nothing of the kind had taken place. The deed, consequently, permits him to go on and sell the goods, as if no such deed existed; to manage and receive the profits of the schooner, and to be accountable for both, if required. The deed is accordingly held up, and not put on the records, nor was the property delivered to the trustee. On the con *429 irary, Lee is not only selling, but adding to his store. For, in 1819, and, I presume, after the deed, (though no date is given) he purchases, on credit, further goods in Baltimore, to the amount of about $557.
All these circumstances convince me, that Lang procured Ace a credit in Baltimore, under a hope that he would thereby be enabled to pay off the debt due to him, which he considered desperate; and it is of no consequence, whether his views and Lee’s were the same, to wit, that being enabled to get other goods and go on in trade, he would finally come out able to pay all his debts; or whether ho intended to get a security on the identical goods. Lang seems finally to have combined, as far as he could, both views, by the deed of trust. In either view, however, and whatever his confidence may have been, in Lee’s honesty, and however well merited, he certainly intended, in this way, to get $500 of his debt paid at once, and to have a better chance for the payment of the residue. Had Aee succeeded as he hoped, he might have paid all; but Lang had no right to better his own prospects of payment, by throwing a risque on others, without a fair disclosure of what he knew of Lee’s situation, and his own, in relation to him. Had this been stated, the credit would not have been obtained; and the $500 of goods received, and the deed of trust, are full proof of the reasons, why this disclosure was not made.
I think, therefore, on this ground, that he has no title to the aid of a Court of Equity.
But, as at present advised, I am also of opinion, that the first ground, taken in the decree of the Chancellor, is correct. For, what fair purpose, can a man take a deed of trust on all the goods in a merchant’s store, expressly stipulating, that the goods are to remain in his possession, until called for by the trustee, and he empowered to make sale of them, and merely rendering him accountable to the trustee? Even if the deed had been instantly recorded, would it import to the world any thing of greater va *430 lidity, as a lien on the goods, than an instrument of writing, whereby a merchant agrees that he owes a given sum, and engages to apply all the net gains of his sales, after his suPPort and reasonable expenses, to the payment of that creditor, and if the debt is not paid by a given day, that he will deliver the goods remaining on hand, to B. to be sold to pay the debt? Would not the creditor here trust solely to the honesty of his debtor, to do what he had promised ? He might pay other debts with the money; purchase other goods with it; or in any other way, violate his promise. Suppose this instrument recorded, and known to the whole world; would it prevent another creditor, having express notice of it, from receiving payment of a debt due to him from the merchant, even from monies which he knew to arise from the sale of those goods ? Or if he takes goods in discharge of his debt, is he in a worse situation than if he had received payment by monies in the drawer ?
It would be readily admitted, that all the purchasers of goods would not have to see to the application of the purchase money, to the discharge of the debt so secured. But it may be said, that another creditor, having knowledge of this supposed lien, knows that a payment to him is a misapplication of the purchase money, and it will be a fraud in him to receive it. But if there is a lien on the goods themselves, before they are taken possession of by the trustee, must not every one see that the trustee or creditor gets the money ? The question then is, does the title pass to the trustee, in such case, before he gets possession ? If it does pass before, then by what right does the merchant continue to sell the goods? We are told he sells merely as factor or agent; and that if a man, knowingly receives a debt due to him by a factor or agent, out of the goods or monies of his principal, it will be a fraud, and he will be liable to the principal. But here there has been no absolute sale of the goods to the creditor or his trustee; no price agreed on; no change of the name of the owner of the store or books; no *431 one act. which attends a sale of the goods; and the store is now conducted for the purchaser. In fact, the original owner remains in possession, sells for himself, and on his own account, takes on himself all bad debts, and to every intent and purpose, is owner, at least until his possession is disturbed, and the goods taken from him by the trustee. Now, though a subsequent deed of trust, accompanied by a delivery of possession to the trustee, might not be such sale as was contemplated by the first deed; yet has any title passed by that deed, until the trustee therein gets possession, which will prevent any bona fide creditor from procuring a proper lien on the property so situated? In other words, are not the covenants in the deed, so entirely opposed to the notion of a security, (any other than the party had in the honor and integrity of his debtor, so long as the goods remained in his possession,) as to oppose no obstacle to a subsequent incumbrance? The debtor might have sold the goods, and paid this last debt, and this payment would have stood good, as all will admit, unless the creditor had notice that the monies, so received, arose from the sale of these goods. The first incumbrancer trusts them, not to his lien on the goods, until his trustee gets them; hut to the integrity of the debtor, and that he will not deprive him of the fund. In this situation, it appears to me, his lien is on the conscience of his debtor, not on his goods. This will not be permitted.
The debtor continues owner or not, of his goods, at the election of one creditor; and thus others are embarrassed in their remedies, and ultimately defrauded; and, therefore, such deed, it at present seems to me, must be considered as void per se. Had the trustee, Browne, taken possession of the goods before the second deed of trust, it might have been another matter, or before a judgment recovered against Lee, in case of a judgment creditor. This was not done. Such act of taking possession might, from its date, have purged the deed of its original vice, by discharging it of (hat condition, which rendered the lien *432 aboi'tive. This deed is not like a mortgage, which stipulates that the mortgagor may remain in possession and receive the profits. There the title to the property itself remains in’ the mortgagee. Here no profits can arise, except by the sale of the goods; and a power to sell, so long as it continues, likens the case to, or makes- it stronger than, that of an absolute deed, the vendor remaining in possession; for that is compatible with a trust that the property shall remain unchanged, and continue the property of the purchaser.
In the present case, therefore, and so far as it regards the deed and delivery of the goods to Henley, I think the creditor under the first deed must be postponed to him under the second.
Judge Cabell:
When, one person requests information from another, concerning the circumstances of a third, for the purpose of determining whether that third person be trust-worthy or not, he from whom the information is sought, may, if he please, decline giving any information whatever. But if, knowing the object of the enquiry, he professes to give information at all, he is, in the language of Lord Kenyon, Eyre v. Dunsford, 1 East. 318, “ bound in justice and in common honesty, to give a fair representation of what he knows. This obligation to make a fair representation, necessarily excludes the right to withhold any known fact, material to the formation of a correct opinion. The suppression of such a fact is equal to the suggestion of a known falsehood.”
This principle is clearly applicable to, and decisive of, the present case.
Lang did not wait to be called on. He volunteered his information, for the purpose of obtaining a credit for Lee; but he concealed the important fact, that Lee was at that moment indebted to him more than he was worth. *433 Had this fact been communicated, it is very probable that the credit would not have been given. However that may be, it was a fact which, in common honesty, he ought to have made known.
Independently of the general conclusion of law, that the suppression of such a fact was fraudulent, in relation to those who are injured by it, Lang’s subsequent conduct affords abundant proof, that in concealing it, he was influenced by an intent to deceive and defraud.
On this ground, I am for affirming the decision of the Chancellor.
As to the other point, that the deed under which Lang claims, is fraudulent per se, it is one on which I feel some difficulty; and as it is certainly one of great importance, and not necessary to be decided in this case, I purposely abstain from giving any opinion on it, that the question may be considered open for discussion, whenever it may again occur, before a fuller Court.

 I would not be understood to impugn the doctrine so well established, and applicable to tbe common case of mortgages and deeds of trust, that possession is no evidence of fraud, where it follows the deed, and is consistent with its purposes. My remarks, indeed, have been made to little purpose, it they have not shewn the wide difference between such cases and that at bai%