## JOHN BRADLEY *versus* STEPHEN CHASE.

Where a person was entitled to shares in an incorporated company on his performing certain acts for them, and where the company did not set up any want of complete performance of the condition as a ground of forfeiture, but conducted in the matter as if full performance had been made, and such person conveyed certain of his shares to a third person ; *it was held* in a court of equity, that it was not competent for the latter to set up such condition to avoid his own contract in the purchase.

Where the property conveyed was materially different from what the seller represented it to be, and from that which the purchaser expected to obtain, this is sufficient, in a court of equity, on the ground of misrepresentation and of misapprehension of what the property conveyed really was, to entitle the purchaser to be relieved from his contract.

But if a settlement of the losses sustained thereby has been made by the parties, after a full knowledge of all the facts, the contract cannot be disregarded or set aside, although the amount received may have been less than *the party might justly have insisted upon.*

If a party would avoid his contract on the ground of fraudulent misrepresentations respecting the property conveyed, he has his election to proceed by bill in equity, or by a defence before a jury, when the contract is attempted to be enforced by a suit at law ; but if he proceeds by bill in equity, he must be governed by the rules of courts of equity.

Testimony which speaks of representations made by the defendant after the sale, is inadmissible to prove the fraud.

Testimony which states the representations made to other persons, and not to the plaintiff, can be used only to prove that the defendant had formed the design to commit frauds in that manner, as opportunities should be offered ; and when such design has been established, that fact may be used, in connection with other testimony, to satisfy the mind, that it was acted upon in making the contract under consideration.

Where material misrepresentations, on the part of the defendant, were established, in a suit in equity, but the bill was dismissed for other causes, no costs were allowed.

THIS was a bill in equity, and was heard on bill, answer and proof, and was very fully argued in writing. Including the arguments, the case extended to two hundred and thirty-five printed, and seventy-four manuscript pages. A statement of the prominent facts, sufficient to understand the questions of law arising out of them, will be found in the opinion of the Court. The legal positions, only, taken by the counsel for the parties, respectively, with the authorities cited in support of

them, can be given without filling a greater portion of the volume, than can be spared for any one case.

*Fessenden, Deblois & Fessenden* and *C. S. & E. H. Daveis,* counsel for the complainants, cited the following authorities in support of their argument.

*Firstly,* that the original contract was void:

I. Because Chase had no title to the property he undertook to convey, and nothing was conveyed to Bradley. 2 Bl. Com. 451; 3 Bl. Com. 166; Chit. on Cont. 133; Story's Eq. Jur. § 134, 141, 142, 143, 208, 219, and authorities cited; *Pasley* v. *Freeman,* 3 T. R. 57, 58; *Bingham* v. *Bingham,* 1 Ves. 126; *Johnson* v. *Johnson,* 3 Bos. & P. 162; *Caswell* v. *Black River M. Co.* 14 Johns. R. 453, 457; *Johnson* v. *Tool,* 1 Dana's R. 469; *Waggener* v. *Waggener,* 3 Munro. 556; *Cox* v. *Strode,* 2 Bibb, 275; *Gill* v. *Corbin,* 4 J. J. Marsh, 596.

And even where the title to a material part fails, the contract will be set aside. 2 Kent's Com. 470 to 476, (3d Ed.) and cases cited; *Roffey* v. *Shallcross,* 4 Madd. 227; *Dalby* v. *Pullen,* 3 Sim. 29; *Edwards* v. *M'Leary,* Coop. R. 308; *Cassamajor* v. *Strode,* 2 Myl. & Kee. 726; *Hammond* v. *Allen,* 2 Sumn. 387, 395; *Allen* v. *Hammond,* 11 Peters, 63.

II. Because Chase had no such interest as he represented, and undertook to convey. *Farrer* v. *Nightingal,* 2 Esp. Ca. 639, (cited 2 Kent, 469;) *Hearn* v. *Tomlin,* Peake's Ca. 192; *Thompson* v. *Miles,* 1 Esp. Ca. 184; *Hibbert* v. *Shee,* 1 Camp. Ca. 113; *Duffel* v. *Wilson,* 1 Camp. Ca. 401; *Belworth* v. *Hassel,* 4 Camp. Ca. 140; *Long* v. *Fletcher,* 2 Eq. Ca. Abr. 5, pl. 4; *Pasley* v. *Freeman,* 3 T. R. 51, 57; *Dutricht* v. *Melchor,* 1 Dall, 428; *Raymond* v. *Bearnard,* 12 Johns. R. 274; *Putnam* v. *Wescott,* 19 Johns. R. 73.

III. Because, if Chase had any assignable interest, there was an incumbrance upon it, which was not known to the complainants. Story's Eq. Jur. § 208; 2 Kent's Com. 570; Sugden on Vend. 5, (2d Ed.) and p. xii. *addendum; Tucker* v. *Woods,* 12 Johns. R. 190; *Junkins* v. *Simpson,* 14 Maine R. 364, 367, 368.

Bradley *v.* Chase.

IV. Because the contract was entered into by the complainants under material mistake. 1 Fonbl. Eq. 120, note *x*; 2 Pow. on Cont. 196; 2 Kent's Com. 471; 1 Pothier on Obl. (by Evans,) 17, 18; 1 Story's Eq. Jur. § 140, 142, and authorities cited; *Hepburn* v. *Dunlop*, 1 Wheat. 197; *Allen* v. *Hammond*, 11 Peters, 63, 71; *Hammond* v. *Allen*, 2 Sumn. 387; *Daniel* v. *Mitchell*, 1 Story R. 172; *Roosevelt* v. *Fulton*, 2 Cow. 129; *Champlin* v. *Leighton*, 18 Wend. 407.

V. Because the contract was made under misrepresentation and concealment by the defendant, as to material and intrinsic circumstances, which the complainants had not equal means of knowing, and under a delusion created by the conduct and representations of the defendant. 3 Bl. Com. 165; 1 Madd. Ch. 262; 2 Kent Com. 482; 1 Story's Eq. Jurisp. § 191 to 218, and authorities cited; Jeremy's Eq. Jurisd. b. 3, p. 2, c. 3, § 1, and authorities cited; *Small* v. *Atwood*, 1 Younge, 407; *Edwards* v. *M'Leary*, 2 Swanst. 287; *M'Ferran* v. *Taylor*, 3 Cranch, 270; *Laidlaw* v. *Organ*, 2 Wheat. 178; *Smith* v. *Richards*, 3 Peters, 26; *Cochran* v. *Cummings*, 4 Dall. 250; *Daniel* v. *Mitchell*, 1 Story R. 172; *Harding* v. *Randall*, 15 Maine R. 332; *Irving* v. *Thomas*, 18 Maine R. 418.

As to the evidence upon this point, see *Beal* v. *Thatcher*, 3 Esp. 194; *Hunter* v. *Gibson*, 2 H. Bl. 187; *Pilmore* v. *Hood*, 5 Bing. N. C. 97; *Dobell* v. *Stevens*, 5 B. & Cres. 623; *Crocker* v. *Lewis*, 3 Sumn. 1; *Bottomley* v. *U. S.* 1 Story R. 135; *Bridge* v. *Eggleston*, 14 Mass. R. 245; *Somes* v. *Skinner*, 16 Mass. R. 348; *Foster* v. *Hall*, 12 Pick. 89; *Howe* v. *Reed*, 3 Fairf. 515; *Hawes* v. *Dingley*, 17 Maine R. 341.

VI. The fact that the price paid by the complainants was grossly beyond the value of the property, and that the bargain was unconscionable, supports these reasons. Jeremy's Eq. Jur. 396, 483; 1 Fonbl. Eq. 122, note; 1 Madd. Ch. 268; Chit. on Contr. 224; 1 Story's Eq. Jur. § 246, 249, 331, and authorities cited; *George* v. *Richardson*, Gilmer's (Va.) R. 231; *Hough* v. *Hunt*, 2 Ham. (Ohio) R. 502.

*Secondly.* Considering the contract of May 6th, 1835, as an *executory agreement*, that the complainants are entitled to recover the consideration paid by them; see Long on Sales, 138, citing *Giles* v. *Edwards*, 7 T. R. 181; *Skillern's Ex'rs* v. *May*, 4 Cranch, 137; *Bullock* v. *Beemis*, 1 A. K. Marsh. 434.

*Thirdly.* That the general language in the writing of January 16th, 1837, does not extend the meaning of that instrument, nor give it any effect beyond what is specified in it, and what the parties had in view at the time; see 1 Story's Eq. Jur. § 145; 1 Evan's Pothier, 59; Jeremy's Eq. Jur. 546; *Stokes* v. *Stokes*, 1 Vent. 35; *Lyman* v. *Clarke*, 9 Mass. R. 225.

And that this instrument was void for the reasons given in the argument; see Chit. on Cont. 222; Story's Eq. Jur. § 217, and authorities cited; *Wood* v. *Downes*, 18 Ves. 120; *Baugh* v. *Price*, 1 Wils, 320, and note; *Cann* v. *Cann*, 1 P. Wms. 723; *Roche* v. *O'Brien*, 1 Ball & Beat. 330; *Dunbar* v. *Tredennick*, 2 Ball & B. 317; *Murray* v. *Palmer*, 2 Scho. & Lef. 486; *Cockerell* v. *Cholmerly*, 1 Russ & Myl. 425; *Crowe* v. *Ballard*, 3 Bro. C. C. 117; *Gordon* v. *Gordon*, 3 Swanst. 400; *Hammond* v. *Allen*, 2 Sumn. 387; *M'Donald* v. *Neilson*, 2 Cow. 141; *Anderson* v. *Bacon*, 1 A. K. Marsh. 51; *Carr* v. *Callaghan*, 3 Litt. 366; see also authorities cited ante, VI.

*Lastly.* That the defendant has not answered .directly, under oath; see Story's Eq. Pl. § 664, 854; 1 Grant's Ch. P. 122; *Taylor* v. *Luther*, 2 Sumn. 228; *Jackson* v. *Webster*, 6 Munf. 462.

*Howard & Osgood*, and *S. H. Chase*, counsel for the defendant, in support of their argument, cited the following authorities; — premising, however, that, in their view, this case involved, mainly, questions of fact rather than law.

I. The answer, being responsive to the bill, must prevail. *Walton* v. *Hobbs*, 2 Atk. 19; *Janson* v. *Ray*, 2 Atk. 140; *Cooth* v. *Jackson*, 6 Ves. 40; *Cook* v. *Clayworth*, 18 Ves. 12; *Clark's Ex'rs* v. *Vanreimsdyk*, 9 Cranch. 153; *Smith*

v. *Brush,* 1 Johns. Ch. R. 460 ; *Daniel* v. *Mitchell & als.* 1 Story's R. 188 ; 2 Story's Eq. Jur. § 1528.

II. Representations made to strangers to the sale, in respect to the property sold, are not material unless they were communicated to the purchaser, so as to become the basis of the purchase. *Crocker* v. *Lewis,* 3 Sumn. 8 ; 1 Story's Eq. Jur. § 191, 192 ; 1 Fonbl. Eq. B. 1, Ch. 2, § 8.

We contend, that the facts involved in this case do not call for, or admit of the application of the principles involved in the numerous authorities cited by the plaintiffs. We have not supposed that there could be any doubts as to the law governing the case, when once the facts were ascertained. In this case, we contest the application of the principles contended for by the plaintiffs, — more than the principles themselves.

An examination of the authorities cited by the plaintiffs, will show that their *theory,* as such, is well constructed ; — but the facts to support it are wanting.

The opinion of the Court was afterwards drawn up by

SHEPLEY J. — The bill seeks relief from one of those unfortunate contracts of the year 1835, by which usually one and not unfrequently both the parties were seriously embarrassed or ruined. The judicial history of those contracts too frequently discloses an infatuation, which substituted fanciful and imaginary schemes of profit for the practical results of business and the past experience of life. ⸲ Sound judgment and a correct moral sense often yielded to the strong desire for sudden or rapid accumulation. The vendors have been found in many cases to have made inflated and deceptive statements ; and the vendees to have exhibited in others an eagerness to embark in delusive enterprises requiring no such statements to effect their ruin. While judicial tribunals may lament the destruction of hopes, and the personal sufferings occasioned by them ; they can only proceed, guided by its principles, to administer the law, which cannot be varied by any of these considerations, and to apply it to the proof introduced in the case before them.

The defendant, acting under the influence of the prevailing excitement, appears to have originated the disastrous enterprise, from which this contract arose. The first important step taken in its execution was the contract made on October 18, 1833, by which the defendant and others subscribed for shares, and authorized the purchase of lands in the State of Georgia for a sum not exceeding forty thousand dollars. This clause is found in the third article of that contract. " And whereas Stephen Chase, Esquire, of Fryeburg, has procured information relative to said lands, and been at pains and expense in examining the subject, it is hereby agreed by the undersigned, that we will severally advance for the said Stephen Chase, provided he will go to Georgia and complete the purchase aforesaid, our proportion of a sum sufficient to pay one quarter part of the lands purchased as aforesaid ; and shall hold the said quarter part as security for the payment of said advance." At a meeting of the subscribers to that contract on October 24, 1833, it was " voted, that Stephen Chase, Abraham Colby, and Samuel E. Crocker, be the agents of the company for the purpose of exploring the lands in Georgia and making the purchases pursuant to the plan adopted." These agents proceeded to Georgia, and before December 26, 1833, appear to have come to the conclusion to contract with Peter J. Williams to purchase seven hundred thousand acres of land at the price of seven cents an acre. Information thereof having been communicated to them by the letter of Mr. Crocker of that date, they, having assumed the name of the Georgia land company, on January 8, 1834, " voted to instruct Stephen Chase, now at Milledgeville, to complete the purchase of seven hundred thousand acres as mentioned in said letter at the price therein mentioned, and to procure good title deeds to the same to the individuals of the company according to the amount of their several shares or interests in the concern." Another vote was passed, at the same time, stating the names of the individuals to whom the deeds were to be taken, omitting the name of the defendant, and containing this clause, " that the land thus conveyed be held for

the benefit of the respective members of the company, who pay their several proportions of the purchase money according to their interest in the land thus purchased." The defendant's answer states, that the obligation of Williams was to convey to the agents, and that he remained in Milledgeville till some-time in the month of March, 1834, "during which time said Williams, in part fulfilment of his said obligation, procured and conveyed to said obligees for said company about three hundred thousand acres of land, described in about fifteen hundred deeds of conveyance. All which proceedings were forth-with communicated to said company, and all the writings and papers relating to the same, including said deeds, were after the return of this defendant placed in the hands of William Willis of Portland, then the secretary and agent of said company." The answer also states, that the agents before leaving Georgia made a contract with Robert Flournoy to secure the right of preemption for their own benefit of about eighteen thousand acres of land near the mouth of the little Ocmulgee river, including certain mills upon it. This contract was after-ward by them transferred to the company. Mr. Willis, in his answer to the defendant's seventeenth interrogatory, says, " my impression is that the title was conveyed both by Williams and Flournoy to Henry Goddard, Enoch Paine, and myself, as trustees of the company. At any rate I am sure, that the title was conveyed to the company ; and that the deeds were in my office." At a meeting of the company on April 18, 1834, it was determined, that " the property of said company shall be divided into forty shares. Ten of said shares, for which the company have agreed to make the payments for Stephen Chase, shall be held by them, until said advances, interest and expenses shall have been paid by said Chase or his assigns ; and the holders of the remaining thirty shares shall pay or cause to be paid all assessments, which may be laid upon said forty shares, and shall be reimbursed for their said advances and interest from the first sales or profits of the land." At another meeting the company, on October 21, 1834, voted, that on or before the completing the purchase of the land and prop-

erty contracted for by said company, so much at least of said property shall be disposed of by sale or by increasing the number of shares, as shall be sufficient to pay the amount of cash advanced with interest and expenses on Stephen Chase's shares; and on the reimbursement of said advances, &c. said Chase shall be entitled to receive his certificate of his shares free from any claim of said company, except such further assessments, as may be thereafter declared on said shares. And if additional shares should be created more than sufficient to pay said advances, the net proceeds of the sales thereof after paying the amount due on the said Chase's shares, shall be divided among the holders of the original stock in proportion to their respective interests." The defendant again proceeded to Georgia with written instructions from the agent of the company, bearing date on Oct. 20, 1834, to procure an act of incorporation for the company; to complete the purchase of the Flournoy mills and property; and to procure further conveyances of land from Williams. An act was passed by the legislature of that State on December 17, 1834, incorporating certain persons and their associates by the name of the Georgia Lumber Company. A contract was made with the executor of Flournoy, who had deceased, for the purchase of that estate. But no further conveyances of lands from Williams were obtained. The defendant's answer states, that he "returned and made a full report of all his doings to said company, which said doings were, at a meeting of said company, acting under and by virtue of said act of incorporation, on the second day of February, 1835, fully ratified and confirmed, together with all the previous acts of the company, before they were incorporated." And it appears, that at a meeting on that day, the Georgia lumber company voted, "that all the acts and doings of the persons associated under the late name of the Georgia land company, relating to the purchase of lands, mills, &c. in Georgia, and all contracts made by persons employed by said company in relation thereto, be and the same hereby are accepted, ratified and confirmed by the company." William Cutter testifies, that the company was organized under its charter, and

that three quarters of its stock were issued before May 6, 1835. William Willis testifies, that in consequence of the proceedings at the meeting on October 21, 1834, the stock was divided into two hundred shares. And this appears to have been done before May 6, 1835. The owners of three fourths of the shares appear to have paid for the property purchased without receiving any aid from the defendant. It was necessary to recite these facts in their order to exhibit the title of the company to the property and the interest and rights of the defendant on May 6, 1835, when he conveyed that interest to John Bradley.

The counsel for the plaintiffs contend, that the contract of sale was void, "first because Chase had no title or interest in the shares or stock of the Georgia lumber company, and none was conveyed to Bradley." It is said, that his title depended upon a condition recited in the first contract of the associates in these words, "provided he will go to Georgia and complete the purchase aforesaid." And that he never did perform that condition by completing the purchase. This could not be a condition to complete the purchase of any particular lands, for there were none then selected or agreed upon to be purchased. Nothing more could have been contemplated, than that he should go to Georgia and complete the purchase of such lands, as the associates should conclude to purchase. It could not have been the intention, that while there and acting as their agent and attending to their business, he should be responsible for the performance of contracts by those, with whom he contracted. This is shown by the subsequent proceedings of the company. The object of the vote passed by the company on January 8, 1834, instructing him to complete the purchase of seven hundred thousand acres, was not to impose a condition, that he should be responsible for the performance of that contract by Williams; it was to authorize and instruct him as their agent to proceed and do all, which they could themselves do, to complete that purchase. The company accordingly, after about three hundred thousand acres only had been purchased, recognize his rights without any such condition, and by their

vote, on April 18, 1834, say, " ten of said shares, for which the company have agreed to make the payment for Stephen Chase, shall be held by them until said advances, interest and expenses shall have been paid by said Chase or his assigns." Another answer to this objection to the title is, that the company do not appear at any time to have set up any such condition or ground of forfeiture against him or his assigns; and it is not competent for any one but the company, or those representing its rights, to interpose to enforce any such condition. This observation is equally applicable also to another objection to the title, that the defendant was instructed to " procure a good title to individuals of the company," and did not do it. And it appears also from the testimony of Mr. Willis, that the company received the title, and did so apparently without any objection to the channel, through which it was conveyed. That the defendant could not establish a legal title to a fourth part of the shares of the incorporated company or to the property conveyed to it, is undoubtedly true. And there appears to be as little reason to doubt, that he had an equitable interest in a fourth part subject to the payment of certain liabilities, for which the shares remained pledged to the company. But it is said, he could have no such equitable interest, because the trustees held the legal title in trust for those, who advanced the purchase money, and that the defendant had not advanced any of it. It has already been stated, that the testimony shows, that this argument is founded upon an erroneous statement of the fact, that the trustees held the legal title, whereas it had been conveyed to the company. But admitting that the company held it upon the terms stated in the vote passed on Jan. 8, 1834, that would not deprive any member of his proportion or interest, who should thereafter pay for it, within such reasonable time, as should be prescribed. The other members of the company having, both before and after that vote, agreed to advance the purchase money for the defendant's proportion, and to hold it for his benefit subject to a re-payment of those advances with interest and expenses, could not pretend, that his rights were destroyed by that vote. And the incorporated

company, having received the title and ratified the former proceedings, would find itself in a like position. It is further contended, that he had no equitable title, because the agreement between him and others, by which his rights were secured, was void on account of his fraudulent representations to them, by which they were induced to enter into the speculation. It is a sufficient answer to this objection, that it does not appear, that those persons or the company ever alleged against him any such fraud, or claimed to avoid their contract on that account. And it is not competent for another person, without authority from them or the company, to assume the right to interfere by making such charges. While the sale of his shares by the company for neglect to pay the amount due upon them would show, that no such objection to his equitable interest was ever made by those, who alone had the right to make it, it could not affect otherwise the question now under consideration, which is, whether the defendant had any interest in them, when he sold to Bradley. The plaintiffs cannot therefore prevail upon this point of their case.

The second point made is, that "Chase had no such title or interest, as he undertook to convey; and if he had any interest, it was materially different from what he represented." To decide upon this point it is necessary to ascertain, what he did undertake to convey; and the best evidence of this is his deed of conveyance. In that he says, I do sell and convey " all the shares together with all the right, title and interest, I have to any and every portion of the stock in the Georgia lumber company, and all the rights, privileges and immunities, to which I am entitled as a stockholder in said company," excepting twenty-two shares. Then follows a power authorizing Bradley to demand and receive of the company certificates for the shares. This power and the language of the deed would indicate, that it could not have been the intention or expectation of the parties, that the shares themselves should be transferred free from incumbrance, but only the right to demand and receive them. This is corroborated, if not fully established, by that part of the answer responsive to the bill, and

uncontradicted, which states, that "in the spring of 1835, herein before stated, this defendant did show said Bradley the votes and doings of said company annexed hereto, as evidence of this defendant's title to a certain amount of said company stock." It was apparent from all these votes, that the defendant's shares were not free from embarrassment, but were pledged for a part of the purchase money and expense. This is further shown in the letter of the defendant on March 4, 1836, to Samuel Fessenden, introduced by the plaintiffs, wherein he says, " all the persons above named read and examined all the votes and doings of the association of gentlemen styled the Georgia land company, touching my rights and interests therein; their construction, as well as mine, of my contract with said company was, that I was entitled to one quarter part of the stock of the company, being fifty shares; that my shares were not liable or subject to any assessment; that they were bound to pay all advances for my part of said stock, and the other stockholders to be repaid or reimbursed for their advances for my shares from the corporate property, the common stock, or from the sales or profits of the land company. The effect of such construction would be, to make my interest of one quarter part of the stock eventually pay one sixteenth part of the whole costs and expenses of said stock." The plaintiffs contend, and the defendant admits, that these representations were made before the sale. And if so, the parties must have been fully informed that the shares were not to be conveyed free from incumbrance. On the contrary it appears to be quite certain, that all parties well knew, that they were liable to pay one sixteenth part of the purchase money and expense. The basis, upon which the contract of purchase and sale was actually made, appears to have been, that the shares were free from all liability or embarrassment except to reimburse the company that sixteenth part, and that they were pledged to the company for that amount. That he did not undertake to convey, and did not convey, the shares free from that liability is established by the testimony. That the purchaser should have taken a conveyance, and have agreed to pay such a large

sum of money for it without any definite description of the interest conveyed, and without any covenants from the vendor to secure any certain interest, leaving the conveyance to pass and secure only such interests, as the vendor might happen to have, can only be accounted for by the strange want of consideration and reflection exhibited in many of the most important transactions at that period.

It is not necessary to prolong this examination of the rights of the parties by an argument to prove, that the defendant's construction of his first contract, and of the subsequent votes of the company, cannot be supported; and that the interest, which was conveyed by his deed to Bradley, was materially different from what he represented it to be, and from that, which the purchaser expected to obtain. And this would be sufficient on the ground of misrepresentation and of misapprehension, of what the property conveyed really was, to entitle Bradley to be relieved from his contract, if he had not made a settlement of this part of his case. For the defendant must be considered as having a more intimate knowledge of the facts and of his own rights, than a stranger to them could have, who would be entitled to rely upon his representations respecting them. But the Court is constrained to come to the conclusion, that a settlement of these misrepresentations and misapprehensions has been made under such circumstances and with such a full knowledge of the facts, that it cannot be disregarded or set aside. The difference in the value of one fourth part of the stock on the estimated expenditure of eighty thousand dollars for the purchase and improvement of the property, if liable to pay a full, and if only liable to pay a sixteenth part of it, would be fifteen thousand dollars. This the defendant admitted in his letter of March 4, 1836, which was communicated to Mr. Bradley. And on the eighth day of the following April, he agreed with Paine and others upon a reference to obtain a decision, whether the shares purchased of the defendant were liable to pay their full proportion. The referees made their award on the seventh day of May following, that those shares were liable to pay their full proportion of

the money expended for the purchase and for the improvement of the property. Mr. Bradley was then in possession of a full knowledge of the misrepresentations, and of their effect upon the value of the shares. He then knew precisely, what his position was in this respect, and no new light appears to have been thrown upon it since that time. At the term of this Court held in November following, he entered into a reference of an action instituted by the defendant upon some of the notes taken in payment for the shares. This reference was discharged on January 21, 1837, In the meantime in the presence of two of the referees, who aided them as friendly advisers and not as referees, he came to an agreement with the defendant for a settlement, and signed the agreement made on January 16, 1837, which states, that they " have agreed on a settlement and adjustment of the controversy and difficulty between them, in relation to the sale of the said Chase to said Bradley of his interest in the Georgia land or lumber company, as by said Bradley's deed from said Chase will appear." After reciting certain terms of settlement, that agreement is concluded in these words. " Said notes given by said Bradley and Warren not to be affected in any way, but hereby acknowledged to stand good and valid to all intents and purposes ; all controversies and misunderstandings being amicably settled and adjusted." The testimony of Samuel Fessenden shows, that this matter was fully agitated and considered, and that the parties finally agreed upon an adjustment of it, and that the sum of seven thousand and three hundred dollars was then indorsed upon the notes on account of it. This sum was not so much by eleven hundred dollars, as Bradley might justly have insisted upon, But where a party with a full knowledge of his rights settles and takes a less sum, than the law would give him ; if he were to be relieved from the settlement on that account, all confidence in the settlement of difficulties would be broken up, and parties would be compelled to litigate until a final judgment was obtained.

It is alleged, that this settlement was not conclusive, because Warren was not a party to it, and that Bradley had no authori-

ty to bind him. The answer is, he was not a party to the purchase, and cannot prevent the parties to that purchase from settling all difficulties arising out of it, as they please. It is also said, that it was not binding because there was no consideration for it. But this is quite erroneous. Bradley obtained by it an indorsement of seven thousand three hundred dollars upon his notes, and Chase submitted to a diminution of them to that amount; and Bradley also gave, and Chase received, additional security for the payment of them. There is no testimony in the case tending to prove, that the settlement was procured by any fraud or misrepresentation. The Court cannot therefore either disregard it, or set it aside.

The third point made is, that "the contract was made under material misrepresentation and mistake in regard to the stock of the Georgia lumber company, and the property constituting that stock." So much of this position, as respects the stock of the company and the misrepresentations in relation to it, has been already under consideration, and the discussion will not be resumed. If the plaintiffs would avoid their contracts on the ground of fraudulent misrepresentations respecting the property conveyed to the company, they had their election to proceed by a bill in equity, or by a defence before a jury, when those contracts were attempted to be enforced by a suit at law. The prosecution of the suit in equity was attended by material advantages by enabling them to call upon the defendant to state upon oath the precise representations, which were made, although no other person might be present, by whose testimony they could be proved. It was also attended by corresponding disadvantages by making such statements extracted under oath from the defendant, who must know what was said and done, equivalent to the testimony of one credible witness. This Court sitting in equity is bound therefore, in the examination of the testimony, to act upon a different rule from that, which would be applied to it on a trial at law. The plaintiffs' counsel would impair the force of the answer by insisting, that the denial of the representations alleged in the bill is not direct and positive, but only according to the defendant's recollection

and belief. It will be necessary to examine and ascertain, whether this be a correct statement of the form of the answer. It states an interview with Mr. Bradley in the month of February or March, 1834, and then recites, what was said and done at that time. It then denies, that at any other time, to the best of his recollection and belief, he made any representations or expressed any opinions respecting the Flournoy purchase, or the value of the property embraced in the contract with Williams. It proceeds and states that the next conversation between them on this subject was in the office of the defendant in the spring of 1835; recites it, and says, that he " declined giving any opinion or description of said land and property in Georgia," but referred him to " the evidence touching said property, its location, character, and value," to be found in the office of Mr. Willis in Portland. It states a third interview between them in Boston, in the month of April, 1835, and their conversation; and a fourth in Portland, on the sixth day of May following, when the bargain was made, and the conversation in relation to it. The defendant next proceeds in his answer, to speak of the representations charged in the bill, and says, " this defendant distinctly denies, that he ever made any representations to said Bradley or Warren, as stated in the bill, other than are herein before set forth, concerning the quantity or quality of the lands so as aforesaid purchased and contracted for on behalf of said company; and that he ever made any statements of the quantity or quality of the timber thereon, its situation, or the facilities for manufacturing and getting the same to market, as stated in said bill; and that he ever made any statements to said Bradley or Warren touching any mill sites, waterfalls, streams, or other privileges connected with said property, as stated in the bill." This is a clear, unqualified, and positive denial of the representations alleged in the bill, and relied upon to avoid the contract. The effect of the whole answer is to make this denial, and to state, according to the defendant's recollection and belief, what was said and done at each interview between those parties. It must, therefore, according to the rule in equity, be considered

as disproving this point in the plaintiff's case, unless its effect has been destroyed by testimony equivalent to more than the testimony of one credible witness.    Has such an amount of testimony been presented?    That part of the testimony, which speaks of representations made by the defendant after the sale, is clearly inadmissible, and it must be disregarded.    The testimony, which states the representations made to other persons and not to the plaintiffs, can be used only to prove, that the defendant had formed the design to commit frauds in that manner, as opportunities should be offered; and when such a design has been established, that fact may be used in connexion with other testimony, to satisfy the mind, that it was acted upon in making the contract under consideration.    Testimony to prove such a design should have little weight, when used to destroy the effect of the testimony of a witness, who knows and states what was actually said and done; while it may have a more important and legitimate influence, when the intentions of a party, and not his acts and declarations, are to be ascertained, and when the case depends wholly or principally upon circumstantial evidence.    Evidence, that representations were made to other persons, is no proof, that the same were made to the plaintiffs.    A person may make statements and bargains with one man, greatly differing from those, which he makes with another.    He may have made statements respecting property, and have become satisfied, that they were of a doubtful or erroneous character, and have concluded to make them no more; and to infer, that he always continued to make the same representations to all persons, would often be contrary to the fact, and manifestly unjust.    Unless, therefore, positive testimony is to be found in the case proving, that the defendant made to the plaintiffs representations contrary to the averments of the answer, that must prevail.    The testimony relied upon to do this, comes from Ruel Barrows, Samuel Ilsley, and Alexander R. Bradley.    The only testimony found in the deposition of Barrows respecting the representations made by the defendant to John Bradley, is in answer to the fifth interrogatory of the plaintiffs, and it is as follows.    "Prior to May 6, 1835, I was

in the office of Stephen Chase, and John Bradley, one of the plaintiffs, was there; said Chase was there exhibiting to said Bradley his plans and maps of his property in Georgia, and explaining to him the mill privilege and situation of the lumber. I do not remember the particular representations, which said Chase then made to said Bradley. I stopped but a short time." How long before the sixth day of May, 1835, this took place, the witness does not state. And there is nothing in this testimony contradicting that part of the answer, which states what took place between those parties in the month of February or March, 1834. The only testimony of Ilsley in relation to this matter, is found in his answer to the same interrogatory. He says, " while I was a clerk in the store of Bradley and Warren, the plaintiffs, and prior to the 6th of May, 1835, said Chase was often in the plaintiffs' store and conversing about the Georgia property. His conversation was usually with Warren, and although I cannot remember the particulars of the conversations, I do remember, that he made favorable representations as to the value of said property. I was about my own business, and did not pay particular attention to what said Chase said." It will readily be perceived, that the defendant might have made representations, which the witness would consider as favorable to the value of the property, without contradicting in the least the statements of the answer. And there is nothing in the testimony of these two witnesses tending to impair its force.

The testimony of Alexander R. Bradley, in answer to the same interrogatory, is more material. In answer to a preceding question he had stated the representations, which the defendant had made to him, and they were in substance, those alleged in the bill to have been made to the plaintiffs. And he says, that the defendant " made to said Warren substantially the same representations, as I have stated above." He then says, " I may possibly be mistaken as to said Warren's being the person conversed with at that time." This last remark so materially impairs the force of the one preceding it, and leaves it so doubtful, whether those representations were

Bradley *v.* Chase.

made to Warren, that it would be wholly unsafe and danger-
ous for a Court to consider the fact as proved by it, if consid-
ered independently of the answer, which denies it.   The wit-
ness also says, "and I think, that on a different occasion at
said office, previous to May 6, 1835, I heard said Chase make
similar statements about said property to John Bradley." There
are two objections to the reception of this testimony as satis-
factory proof in contradiction of the answer.   One is, that the
witness cannot and does not state positively, that such repre-
sentations were made.   He only says, that he thinks, they were.
The other is, that it is uncertain, what the representations
were, if they were made.   The witness does not attempt to
state the language used by the defendant; nor does he state
the ideas, which he communicated with such reasonable cer-
tainty, that the Court can come to a satisfactory conclusion, as
to what they really were.   The witness does not say, they were
the same representations, which had been made to himself, but
only that they were similar.   And the Court is only authorized
to consider, that there was a resemblance or likeness. between
them.   How close that was, is left doubtful.   The Court could
not feel the least assurance, that a conclusion on a point so
material and vital would rest on any solid foundation, without
having the ideas, which were communicated in that conversa-
tion, stated in the testimony, that it might judge how far they
were contradictory to the answer.   The witness further says,
"I have a perfect recollection of hearing said Chase, prior to
May 6, 1835, in the plaintiffs' store, speak in high terms of
said property; his conversation was directed to one or both of
the plaintiffs; I cannot say to which.   The conversation on
this occasion seemed to refer to some prior conversation be-
tween the parties."   The remarks, which were made, when
he spoke in high terms of the property, are not related in the
testimony; and he might have spoken in high terms of it with-
out making any of the representations alleged in the bill and
denied in the answer.   The very minute examination of this
witness, in a deposition taken by the defendant, does not ap-
pear to vary materially the effect of his testimony.   If the tes-

timony of the witness were in direct and certain conflict with the answer, the Court would not be authorized to consider the answer as disproved without corroborating circumstances. But it is so far from being in direct conflict with it, that the allegations of the bill could not be considered as satisfactorily proved, considering the witness entitled to full credit and confidence. And regarding the answer as testimony, as it is bound to do, it is not possible for the Court to come legally to the conclusion, that fraudulent representations respecting the property conveyed to the company, were made to induce Mr. Bradley to make the purchase.

Nor does the testimony disclose any such mutual mistake respecting that property and its condition at that time, as would authorize the Court to rescind the contract. Especially, when it considers, that the plaintiffs had an opportunity for more than twenty months to obtain information respecting that property, before Mr. Bradley signed the settlement on Jan. 16, 1837, stating that all controversies and misunderstandings were amicably settled and adjusted. And this he did after having information for about ten months, that he had been deceived with respect to the amount, for which the shares were held by the company, and thereby cautioned to examine the whole transaction anew, and to ascertain, whether there were other just grounds of complaint, before he settled with the defendant. Although it is apparent, that the plaintiff may sustain very heavy and even ruinous losses; yet the Court, taking into consideration that settlement, is not authorized on this testimony to give relief.

The bill is dismissed. But as a misrepresentation on the part of the defendant has been established, he is not entitled to costs.