1838.

Moffat
v.
Winslow.

---

MOFFAT & CURTIS *vs.* WINSLOW and others.

A bona fide sale of stock which has a speculative value in the market will not be rescinded, although the stock has been sold at a very extravagant rate, merely on the ground that some of the officers of the corporation have been guilty of a fraudulent deception by which both the buyer and the seller were induced to suppose the actual value of the stock was much greater than it really was.

Where the stock is entirely worthless, and has not even a speculative value except what is the result of the fraudulent misrepresentation or deception of a third person ; whether the vendor can recover upon a note given for the purchase money, or whether the note is void for want of consideration ; *quære ?*

The court of chancery will not relieve from an improvident contract for the purchase of stock which has a speculative value in the market, where the

sale is without fraud or warranty, although the stock is sold at a price f:r beyond its real value.

The agent of a corporation is not the agent of the individual stockholders, so as to vitiate a sale of stocks on account of his frauds to which the seller was not privy.

1838.

Moffat
v.
Winslow.

This was an appeal from a decision of the vice chancellor of the first circuit, dissolving the injunctions issued in this cause restraining the defendants severally from proceeding at law to collect certain notes. The original consideration of the notes was the purchase, by the complainants, from the defendants N. Ri.hards and C. H. Richards, severally and at different times, of certain shares of the capital stock of an incorporated company by the name of "The Virginia Mining Company," chartered by the legislature of Virginia for the purpose of working gold from mines generally in that state. Previous to the incorporation of the company, the defendant N. Richards and one N. Taylor had become the owners of certain gold mines and mining privileges in several places in Virginia, the original cost of which with the improvements thereon made by them was about $43,500. These lands and mining privileges they had divided into one hundred shares, estimated at $1000 each; and a private company had been formed, consisting of these two persons, and seven others who upon an investigation of the quality of the ore in some of the mines became share holders at that price. And W. K. Smith, having afterwards purchased from one of the associates three shares, became also one of the company. After the incorporation of the company the capital stock was divided into 3000 shares of $100 each, and was afterwards increased to 5000 shares; making a capital of five hundred thousand dollars, the amount to which the capital was limited by the charter. These ten associates subscribed for and became the owners of the whole amount of stock, in proportion to the amount of their respective interests in the mines and mining privileges before owned by them; the defendant N. Richards being then the owner of one fourth and the defendant C. H. Richards of three fifths of such mines and mining privileges. And the several interests of the original associates therein

March 6.

1838.

Moffat
v.
Winslow.

were thereupon transferred to the corporation, in payment of the stock so subscribed by them respectively. N. Taylor was elected president of the company, and N. & C. H. Richards with some of the other associates were elected directors thereof. As most of the associates lived in the. neighborhood of New-York, W. K. Smith of Virginia, one of the stockholders who professsed to be well acquainted with gol l mining operations, was appointed the general agent of the corporation, to superintend the working of the mines, and the extracting of gold from the ore at the principal mine called the Orange mine. Having become the owner of a considerable number of shares of the stock of the company, Smith, either for the purpose of enhancing the value of his property therein, or for some other reasons not explained, made to the directors of the company and others from time to time grossly false and fraudulent representations as to the quality and richness of the ore produced from the Orange mine. He also sent on to the directors at New-York, as fair specimens of the ore extracted from the mine, several parcels of ore ; some of which the complainants and Wilmarth their copartner were employed to assay. In the course of the complainants' employment as such assayers they became acquainted with the representations which Smith had made, as to the richness of the ore and the quantity of such specimens contained therein. And from the result of their assays in connection with the representations which Smith had made, both the complainants and the defendants formed very extravagant ideas of the real value of the Orange mine, and of the stock of the corporation ; the result of such assays, in connection with the representations of Smith, showing that the property of the corporation was worth many millions of dollars. The consequence was that the complainants and Wilmarth became desirous of participating in the profits of the corporation by a purchase of some of the stock. They accordingly purchased of the defendant N. Richards 20 shares of his stock in the corporation, at the rate of $250 per share ; and gave their copartnership note for the amount, with interest there-

on, payable in one year. This note was renewed, and the interest thereon paid from time to time, until November, 1834, when, Wilmarth having died, the complainants gave two notes for the principal of the debt, one of $2450 and the other of $2550 ; which were a part of the notes in controversy in this suit. Soon after this purchase Moffat, one of the complainants, paid a visit to the Orange mine in person ; and after having examined the same and seen and conversed with Smith, he wrote home such a flattering account of the probable value of that mine, that his copartners were induced to make a purchase of the defendant C. H. Richards of 19 shares of his stock, at the extravagant price of $500 per share ; for which they gave to him the partnership note, payable in 18 months with interest. And the defendant N. Richards, in consequence of this favorable representation of Moffat, was himself also induced to purchase stock to the amount of about $12,000, at the rate of $450 and $475 per share. In November, 1833, C. H. Richards being about to visit the West Indies for his health, and wishing to pay his brother the sum of $8000, the complainants and Wilmarth consented to divide the note of $9500 given upon the purchase of the 19 shares from him. They accordingly gave to N. Richards two notes amounting to $8000, payable to him or his order, with interest, in December, 1834 ; which notes were accepted by him as a full discharge of the debt due from C. H. Richards. And another note was given for the residue of the $9500 note and interest payable to the order of C. H. Richards ; which note was afterwards transferred to the defendant R. H. Winslow. These three notes were also in controversy in this suit. In October, 1833, Moffat and Wilmarth, together with one of the directors of the corporation, went to the Orange mine, Smith the superintendent having then resigned, for the purpose of working the mine by means of an improved machine. And they then discovered the impositions practised upon the directors and stockholders by Smith, and found that the stock was merely an ordinary mining stock of comparatively little value.

This bill was filed to restrain the collection of the notes, given by the complainants, as above mentioned, in renewal or exchange for those originally taken by C. H. Richards and N. Richards respectively, upon the sales of stock to the complainants and Wilmarth. Upon the coming in of the answers, applications were made, on behalf of the defendants respectively, to dissolve the injunctions which had been granted on the filing of the bill. The vice chancellor held that this court had no jurisdiction or power to relieve the complainants on account of the misrepresentations of Smith who was not the agent of the individual stockholders but of the corporation; there being no pretence of fraud or misrepresentation on the part of the defendants who sold the stock. The injunctions were therefore dissolved. From the orders of the vice chancellor dissolving the injunctions respectively the complainants appealed.

*R. Sedgwick & W. Emmerson,* for the complainants.

*N. P. Hall,* for the defendant N. Richards.

*A. L. Robertson,* for Winslow and C. H. Richards.

THE CHANCELLOR. The vice chancellor was clearly right in the conclusion at which he arrived, that Smith could not be considered as the agent of the individual stockholders, so as to make them responsible for his frauds, or to vitiate a contract made by an individual stockholder for the sale of his own stock. Neither is there any pretence in this case that the complainants were induced to purchase from any misrepresentations made by either of the defendants. If they made any representations to the complainants, they represented nothing but what was true; to wit, that Smith had made certain statements in relation to the quantity and quality of the ore which he was obtaining from the Orange mine. These representations, even if made in the hearing of the complainants, and I presume such were made by one of the defendants, were not made for the purpose of inducing them to purchase the stock, but were made while in communication with the complainants as assayers for the corporation. When the complain-

ants afterwards undertook to deal with C. H. Richards, not in their character of assayers but in the character of purchasers of his individual stock, both parties were acting for themselves in their private capacities. Both were therefore under the same obligation to ascertain what reliance should be placed on the representations of Smith; for he was the agent of neither party in relation to such a transaction.

In the case of *Colt* v. *Woollaston & Arnold,* (2 *P. Wms. Rep.* 154,) Sir Joseph Jekyll relieved the complainant against a contract for the purchase of stock in a mere bubble, fraudulently gotten up for the alleged purpose of extracting oil from radishes. In that case, however, the stock was really worth nothing, and the defendants knew that fact, when they induced the complainant and many others to subscribe to the same and took their money. The defendants there also made false representations to the subscribers, by stating that the contributors had landed security which would prevent them from hazarding the amount of their subscriptions, although the defendants well knew the land was previously pledged for nearly treble its value. And the decision in that case was put upon the express ground of fraud. It was upon that ground also that his honor refused to listen to the objection that the complainants had a remedy at law; the court of chancery having a concurrent jurisdiction with the courts of law in cases of fraud. But if the mere fraud of the directors and officers of a corporation, to enhance the value of its stock, was of itself sufficient to authorize the court of chancery to rescind contracts for the sale of stocks at extravagant prices, made by those who were not privy to such frauds, nearly all the contracts for the sale of stocks in the South Sea Company, at 1000 per cent, which took place the same year in which the radish bubble and many others of the same character were projected, would have been rescinded. In that case the directors and officers of the South Sea Company were guilty of the most outrageous frauds to enhance the value of the stock; for which their whole property was taken from them by act of parliament, for the benefit of the sufferers in consequence of such frauds. But although thousands were ru-

ined by their speculations in this stock, and various questions were brought before the courts upon contracts for the transfer of stocks at the most extravagant prices, between parties who were not privy to those frauds, I have not been able to find a case in which such a contract was set aside on account of any fraud of the officers of the company, of which fraud the vendor of the stock was not cognizant at the time of the making of his contract of sale. Those who purchased the new stock created by act of parliament, from the company itself, at three hundred per cent advance, would undoubtedly have been entitled to relief against the frauds of Sir John Blount, the projector of the South Sea scheme, and his associates in the direction. But as those original purchasers were afterwards enabled to sell that stock at still more extraordinary rates, they probably availed themselves of the opportunity. They thus being gainers instead of losers by the frauds of the officers of the company, and therefore had no grounds of complaint. The subsequent cases in which relief has been given to the purchasers of stock in mere bubbles, some of which are referred to in the opinion of the vice chancellor, all go upon the ground of fraud in the vendors. And the decisions in those cases are professedly based upon that of Sir Joseph Jekyl in the case of the radish-oil bubble. (*See* 1 *Sim. Rep.* 37, 45 ; 2 *Idem*, 289.)

I am not prepared to say that a vendor of stock, or of any thing else, which at the time of the sale was entirely worthless, and which had not even a speculative value except such as arose from the fraudulent misrepresentations of a third person, could recover upon a note given for the consideration which thus entirely failed. But where the article sold is of some value, and there is neither fraud or warranty on the part of the vendor, this court cannot rescind the sale, or relieve the purchaser, upon the ground that he has made a very bad and improvident speculation. Here the complainants' bill shows that at the times when they purchased these stocks they were aware that, if the representations of Smith were all true, the actual value of the shares they were purchasing was much greater than the prices they agreed to give. They

therefore intended to secure to themselves the benefit of a very profitable speculation. And as they would have been entitled to those extravagant profits, by the purchase of these shares in a mine worth many millions if their visionary expectations had been realized, they must, as many others have done recently, submit to the loss they have sustained by their improvident and speculative bargains.

There is ano.her objection also to the relief claimed in this case; which is that the complainants affirmed the contracts for the purchase of the stock by giving new notes for the purchase money after the frauds of Smith had been discovered. Smith resigned as superintendent in September, 1833; and in October Moffat and Wilmarth went on to work the Orange min* themselves, and the frauds of Smith were then discovered. In the latter part of November thereafter the complainants, and Wilmarth their copartner, took up the note originally given to C. H. Richards, and gave two of the new ones to N. Richards in exchange therefor; knowing that the object of this arrangement was to pay a debt then due to the latter. It would therefore be a fraud upon N. Richards for them to set up as a defence to these notes the existence of the previous misrepresentations of Smith, of which they were well aware when such notes were taken by him in payment of the debt of C. H. Richards. And the notes given upon the purchase of N. Richards' stock were also renewed repeatedly after that time; and the new notes now in controversy were given after the death of Wilmarth in the fall of 1834. After these repeated recognitions of the validity of the original contracts, long after the facts in relation to Smith's frauds were fully ascertained, it is too late for the complainants to set up the existence of such frauds as a defence to these new notes.

For these reasons the order appealed from must be affirmed with costs.