## Case No. 17,181.

### WARNER v. DANIELS et al.

[1 Woodb. & M. 90; [1] 9 Law Rep. 160.]

Circuit Court, D. Massachusetts. Oct. Term, 1845.

COMPETENCY OF WITNESSES—RESCISSION OF DEEDS—MISTAKE AND FRAUD—PRESUMPTIONS—FAILURE OF CONSIDERATION—ADMISSIBILITY OF EVIDENCE—DISCOVERY IN AID OF ACTION AT LAW—LIMITATIONS AND LACHES.

1. In a suit in equity brought by the vendor of land to set aside the conveyance for fraud, a mortgagee of the vendee was brought in to defend. but it was shown that the mortgage was discharged before the bill was filed, and there

1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

was no evidence of any collusion. It was *held,* that the mortgagee was a competent witness for the respondent; but that he would not have been, if he had remained interested.

2. A witness is not rendered incompetent by having received a copy of the interrogatories before the time of testifying, without any comments or any influence used to affect his answers.

3. A witness is not rendered incompetent by having received a letter from one of the parties, requesting him to tell the whole truth, without any suggestion as to what the writer considered the truth to be.

4. A mistake as to the value of the consideration given for the conveyance of land, is not a sufficient ground for setting aside the conveyance, where the vendor had means of avoiding the mistake by inquiry. and no fraud or falsehood was used to influence his judgment.

[Cited in Mason v. Crosby, Case No. 9,234: Veazie v. Williams, 8 How. (49 U. S.) 150: Grymes v. Sanders. 93 U. S. 62.]

[Cited in brief in Pratt v. Philbrook, 41 Me. 138. Cited in Shaddle v. Disborough, 30 N. J. Eq. 381.]

5. But if a vendor of land is clearly shown to have been overreached in a material degree, by impositions, concealments, or misrepresentations, made by the vendee, on which he properly relied, he will be relieved in equity.

[Cited in Ferson v. Sanger, Case No. 4,752: Tuthill v. Babcock. Id. 14,275; Austin v. Felton, 41 Fed. 163.]

6. And to sustain such a *charge,* the whole circumstances of the case. and the character and relations of the parties, are proper subjects of consideration.

7. Courts of equity can go more on what is called "presumptive evidence," than courts of law.

8. Where the bill charges that a company, represented by the respondents to have been duly organized, was never duly organized, the record of the organization is the best, and suitable evidence, of the fact, and not the oath of one of *its* officers.

9. Where the vendee of land made representations respecting the value of what was taken for the consideration. which were false in material points, and which influenced the vendor to sell, whether the vendee knew them to be false or not, it was held that they would vitiate the sale.

[Cited in Frenzel v. Miller, 37 Ind. 12: Smith v. Countryman. 30 N. Y. 671; Woodruff v. Garner, 27 Ind. 9.]

10. So. also, if they were made by another person. in the presence of the vendee, and he was benefited by them.

11. Suppressio veri, is as fatal as suggestio falsi.

12. Conversations of the respondent with other persons, on a subject of a kindred character. near the time of the transaction, and illustrating his intention, are competent evidence for the complaint.

[Cited in brief in Pratt v. Philbrook, 41 Me. 134.]

13. An *entire failure of consideration,* in the receipt of what is mere moonshine, is often sufficient to rescind a contract; although mere inadequacy of consideration is not sufficient.

[Cited in Clark's Appeal. 57 Conn. 573, 19 Atl. 332.]

14. Where the aid of a court of chancery is indispensable to obtain the discovery of the important facts in the case. an application for relief can be sustained in connection with that discovery, in the circuit courts of the United

States, notwithstanding the 16th section of the judiciary act [1 Stat. 82], prohibits such relief, when it can be obtained at law in as ample a manner.

[Cited in Foster v. Swazey, Case No. 4,984; Jewett v. Cunard, Id. 7,310.]

15. Length of time, short of the statute of limitations, is sometimes a bar; but not if fraud exists, or if the delay is accounted for, or if such a course would work injustice.

[Smith v. Babcock, Id. 13,009; Veazie v. Williams, 8 How. (49 U. S.) 158.]

16. If either party cannot restore the property in good condition, damages may be given; and if the inability to restore happens by the course of the complainant, it should not prevent his obtaining relief in some manner, if he was not then aware of the fraud.

[Cited in Simpson v. Wiggin, Case No. 12,-887.]

[Cited in brief in Gatling v. Newell, 9 Ind. 587.]

17. D. purchased a farm of W., paying him therefor in shares of the stock of the Cleft Ledge Granite Co., which he represented to be worth $6000. Several representations were made to W. by D. and also by F., who was concerned in the same company, to induce W. to take the stock in payment, which representations proved to be false, and the stock worthless. On a bill in equity by W. for relief, it was decreed, that the sale should be rescinded, the shares reconveyed by W. to D., and the farm by D. to W., and a master appointed to report the amount of rents and waste, after deducting permanent improvements, which should be allowed to W. by D.

18. But if neither the land nor the shares could be reconveyed, the master must examine and report the damage done to W. by the misrepresentations of D. and F., and a decree be entered against them for the amount. And if the land could be reconveyed, and not the shares, the land must be reconveyed, and the value, if any thing, of the shares, at the time of the sale, deducted from the net income, and a decree made for the balance.

[Cited in Almy v. Wilbur, Case No. 256.]

This was a bill in equity. It alleged that on the 19th of November, 1836, the complainant [Samuel Warner] was seized of a farm in Wrentham, in this state, worth $6000; that [Adams] Daniels and [Josephe.] Fales then held what purported to be certificates of shares in the Cleft Ledge Granite Company in New Hampshire, valued at $6000, the company having a capital paid in of $200,000; that they proposed to purchase said farm of the complainant for a valuable consideration, and pay him in shares of said company; but in order to induce him to make the exchange, they averred, that the stock was worth its nominal value in Boston, and more than any Boston bank stock; and that it would pay a handsome dividend next spring; and if the quarry was worked, would yield 100 per cent. on its value; that they wanted the farm for the silk business; that they owned a brig, employed in carrying stone, and wished the complainant, formerly a sea captain, to command it, by which he would make $1500 a year; that they owned some other vessels employed in the same business, had a number of contracts for furnishing stone, and one with the government for $100,000; that several

persons from Newport had bought into the company, and that Colonel Bates and various other men were employed by it, and large contracts, through their influence, were likely to be obtained at Newport and Portsmouth in behalf of the United States. The bill next alleged that, relying on these assurances, he entered into an agreement with the respondent, Daniels, who was then acting for himself and Fales, to convey to him the farm for $6000, to be paid for in said shares at the price per share which should be paid in per share when the deed was executed; and that still relying on the aforesaid assertions of Daniels and Fales, the complainant, on the 8th of December, 1836, made a warranty deed of the land to Daniels, and received from him therefor a number of papers purporting to be certificates of 240 shares in the Cleft Granite Ledge Company, representing $25 each of its capital stock, amounting by computation to $6000, and which were the only consideration paid to him by Daniels, and were received on the supposition that $25 had actually been paid in on each of them.

The bill further alleged, that the company never, in truth, had any thing paid in on said shares, or any of its capital; that it was a mere fiction, got up to defraud the public; that the stock never had or could have any value; that the certificates therefor were false and fraudulent, and so known to be to Daniels and Fales, and that they were aware that the assertions made about them were false, and with intent to defraud the complainant. Moreover, in order to "bewilder" the complainant, and prevent him from causing the conveyance of the farm to be annulled, it was averred that Daniels, on the 10th of December, 1836, executed a mortgage deed of the farm to Elisha F. Fales, a brother of J. E. Fales, purporting to secure a note of the same date to him for $1765, and for the same purpose, on the 9th of October, 1837, Daniels made another mortgage thereof to S. B. Scott, a copartner in trade and brother-in-law of Daniels, to secure a note of the same date for $4200; and it was charged, that the mortgagees conspired with Daniels and Fales to enable them to complete their imposition on the complainant, and took the mortgages without any bona fide consideration passing between them; and prayed that they be made parties to the bill. The bill alleged further that, notwithstanding all these falsehoods and frauds, the respondents had refused to yield any relief; had cut valuable timber from the land; had declined to get the mortgages discharged, and to reconvey the land, or to pay rent for the same, or pay to him the nominal value of the shares; and therefore it put them to answer certain interrogatories under oath: and concluded, praying a decree against them for the $6000 and interest since the original conveyance, or to have the mortgages cancelled and the land reconveyed with payment for the strip and waste and rent. A prayer was also interposed for an injunction against

waste during the pendency of the bill, and the appointment of a receiver of the rents.

The answer of Daniels admitted that Warner once owned the land, but denied it to have been worth even $3000; and averred that he and Fales, being in Wrentham about the time named in the bill, accidentally, without any previous concert or design, heard that the complainant had a farm to sell, and expressed a willingness to buy it, if they could be allowed to pay for it in their way; that they examined the farm and informed him they had no means to pay therefor, except in shares of the Cleft Ledge Granite Company; but denied that he exhibited more than one certificate of said shares, or any papers, showing it had a capital stock paid in of $200,000, or that said stock was alleged to be of par value, or would pay a handsome dividend, or that the farm was wanted for the silk business, or that the company owned a brig, &c.; and extended the denial to all the averments of that description, set out in the bill; and to any other of like tenor, said to be made either by him or his agents. The answer then proceeded to allege that in August. 1835, Daniels purchased about 300 acres of land in Maine; for which he gave $8 per acre, paying ¼ in cash and the rest in three annual instalments; and in October. 1836, sold ¾ of his interest in the same to Joseph Fales at cost, taking in payment therefor Fales's obligation for $5249 in Cleft Ledge Granite stock, and the balance in notes of that company, and that in his first interview with Warner he informed him of this obligation from Fales, and left with him a copy of the act of incorporation of the company, and the by-laws and list of officers thereof, and a report of Doctor C. T. Jackson, a distinguished geologist. as to the quarry; and stated only the truth on the subject. The answer further declared that the respondent Daniels informed the complainant, he was but little acquainted with the value of the stock; but that Warner could visit Boston and ascertain its value, and go to Durham and examine the quarry before trading, and if then concluding to make the exchange, might find him at the Lamb Tavern in Boston. That in about a week after, Warner did visit Boston, and said he came to inquire into the value of the stock; but little passed between them till the next evening he informed the respondent that he had conversed with the president of the company, and was willing to take the stock at par value, if the price of the farm could be mutually agreed on; that the parties spent nearly two days in settling the price at $6000, being much beyond the true value, in consequence, as the respondent avers, of false and exaggerated representations of the complainant; and that in the course of the conversations, then had, the respondent learned, for the first time, from the complainant, that the quarry had been purchased originally for $4500 by some individuals connected with it, and then sold to the company for $53,000, the latter giving notes on time for

the consideration, and which must be paid before a dividend could be made; that this would take a long period, and the holders of the notes must receive stock in payment, or it must be sacrificed in the market to pay the notes; that the quarry might not prove as good as it now appeared; and urged these facts, not before known to Daniels, as considerations to induce him to give a larger sum for the farm in exchange for the stock at par; that thereupon he decided to give the $6000, payable in stock at par, and a bond was accordingly drawn to secure the fulfilment of the bargain; that Fales had no agency, or instructions, or part in the business; that, on the 8th of December, Daniels, having received from Fales 240 shares in said company, made out to Fales and by him assigned to Warner, proceeded with it to Wrentham, and Warner caused a deed to be executed to him of the farm, on receiving the shares aforesaid; and declared at the time, he knew all about the stock, and more than the respondent; that no complaint was made to him by Warner about the trade, wishing to annul it, till August 18th, 1841.

The answer stated next, that Warner, on the 16th March, 1840, parted with all his stock except 24 shares; that he has no reason to believe the company to be a fiction, got up to defraud; but believes it possesses a valuable quarry of granite in Durham. N. H., examined and so reported by Dr. Jackson; that the quarry was bought by four persons in the fall of 1835, viz.: J. E. Fales, J. C. Thompson, James M. Thompson, and Newell A. Thompson, for $4500; that about $3500 were afterwards expended on it in roads, wharves, and shops, employing near fifty men there before they sold it to the company, and fully testing the good quality thereof; that several persons not interested there, united with those four in petitioning the New Hampshire legislature for an act of incorporation: and on the 10th of June. 1836, they were duly incorporated, and on the 25th of August ensuing, purchased the quarry for $53,000, payable ¼ in one year and ¾ in annual instalments thereafter; that the capital stock was divided into 2000 shares, at $100 each, and on the 7th of December. 1836, only 303 shares had been issued, on which 30 per cent. had been assessed and paid; that on November 28, 1836, it was agreed to increase the number of shares to 8000, and to reduce the par value to $25 each; that the old certificates were to be renewed, and that on the 7th of December, Fales being the holder of 73 shares of old stock, surrendered them for 240 shares of the new stock, paying the difference by cash $10 and $3800 indorsed on the note he held against the company; that these are the same shares sold to Warner, and were paid for by the respondent by giving up to Fales his obligation before named for $5249 and the balance by a note, of which $400 was since paid in cash, and the rest by a note of Fales bought of a third person by Daniels; that Daniels has never mortgaged the land to

bewilder Warner or defraud him, but for bona fide debts, since paid, and the mortgage of one debt was discharged about the 1st of February, 1842, before the filing of the bill in this case, and the other about the 25th of September, 1841; and denied all collusion with the mortgagees to defraud Warner, and all false statements in any way concerning the stock. The answer then proceeded to reply to the different interrogatories in detail; in the course of which, it was averred, in addition to what has already been stated, that he owned no stock in the company before the 240 shares, nor any since except 40 shares; that the sums paid to the company by the stockholders are unknown to him; but he has been told and believes they have been $12,900 or $6900, beside the $6000 worth in dispute in this case. The old shares issued are stated to be 230, and the new 240. Most of the assessments and shares appear to have been paid by indorsements on notes the company owed, or for services done the company; and the cash for all does not seem to exceed from $100 to $1000, though some more is claimed.

The answer of J. E. Fales accords in substance, so far as he knows any thing, with Daniels' answer, and denies all joint interest in the subject-matter, or any co-operation together in the trade, or any agency on his part in it for Daniels or himself, though admitting he was one of the original purchasers of the quarry, and a member of the company and director, and under contract to convey shares to Daniels at his first interview with Warner, and so informed the latter; and that Colonel Bates was their agent at a salary perhaps of $1200, but not $1500, and had a clerk and a large number of hands employed, and was negotiating for various contracts; but denies he said any had been made, except at Portsmouth; or that any persons at Newport were imploring contracts; though he admits he stated that several persons there had bought into the company; that when Warner came to Boston, some days before the 28th of March, 1836, Fales, at his request, introduced him to the president and clerk of the company; but denies any interest in the sale to him, or in the farm, or any misrepresentation then or before as to the company or its property, and denies that the company was a fiction, but avers that it 'originated and was organized and bought the quarry as before described; that there was nothing in the manner of conducting the company designed or likely to defraud; that at the time of this transaction the quarry was worked and a large quantity of stone sent to Portsmouth and New York, and large sums received therefor, and more stone was got out, which was attached by one of its creditors; that the first assessment on the shares was $25 and the next $25; and the certificates were not issued till the assessments were paid; that, at the time of the trade, he did entertain and express sanguine opinions in respect to the value of the stock; that it was worth its nominal value, and would pay a handsome dividend; and so Warner professed to think, after making certain estimates; that he said nothing about a brig or vessel to be commanded by Warner till near a year after the sale of the farm; that the land he obtained of Daniels for the shares was valuable, and its cost can be realized from it; though he has since taken the benefit of the bankrupt law in Massachusetts.

The answer of E. F. Fales and Scott accorded in respect to the mortgages to them, with what was stated in Daniels' answer.

Exceptions were filed to the answers of Daniels and J. E. Fales for alleged omissions and evasions, and they both put in amended answers; Daniels denying that he furnished to Warner any estimates of the value of the stock, or stated as a fact its value; but averred that he insisted to Warner that he must inquire and decide for himself, and buy on his own judgment, if at all, and that Warner did inquire, and knew as much about its value as any one; that Daniels and Fales were not looking for a farm when the first interview took place, but the complainant applied to them to buy; that no mortgage remained on the Maine land sold to Fales, which prejudiced its value, and the consideration promised by Daniels for it had been paid to the extent of $4000 before the sale to Fales, and the rest since; that if the shares are now worth less than they were in 1836, it is owing to the general change in trade and enterprise; and their value in 1836 as compared with the farm was better known to Warner than to Daniels, and for aught Daniels knows, is now equal to the value of the farm; that since the trade with Warner, he has purchased 54 shares more in the company, of Newell A. Thompson, at $25 per share, by taking them at par in part payment of some land sold to him; that Fales appears by the books to own since, 135 shares more, but how he obtained or paid for them is not known to the respondent Daniels; that the company had, in December, 1836, besides the property before stated, tools, carts, a blacksmith's and hammering shop, and various blocks of granite, partly hammered, all of several thousand dollars in value.

Fales, in his amended answer, adds only the following facts, which it is deemed material to state, viz.: That the company commenced issuing shares on the 24th of October, 1836; that on the 19th of November, the company owned the quarry and farm connected therewith, and buildings, wharf, forges, tools, shops, carts, several yoke of oxen, &c., and the real estate, subject to a mortgage for the purchase-money; that a large part of the purchase-money had been paid for by the proceeds of the stock sales at that time, and valuable additions made to the means of the company by aid and credit from individuals, and all had been duly appropriated; and that this was the subject of conversation with Warner when he came to Boston to inquire; and as the operations and organization were new, the value of the stock lay rather in estimates and opinions

of what would be yielded thereafter, than the intrinsic value of the quarry; that Daniels had paid $10,000 towards the Maine land, sold to him before their trade, and has since removed the mortgage then on it for the balance of the consideration; and that Fales at once took possession of that land, and exercised acts of ownership over it till sold by him in 1837; that one half of the original purchase-money for the quarry had been paid in cash before Warner's trade, and the balance was secured by mortgage; that $40,000 of the second purchase had been paid, and the rest secured by a second mortgage; and all this was made known to Warner before his trade.

The evidence in the case was voluminous, and will be further referred to in the opinion, so far as material to the facts, which are found to be proved satisfactorily, and which bear on the points of law decided by the court.

Jonathan P. Bishop and George M. Brown, for complainant.

Benjamin R. Curtis, for Daniels.

Frederick W. Sawyer, for Fales.

WOODBURY, Circuit Justice. There was a preliminary objection in this case, as to the competency of the testimony of Scott and Gilbert, and G. C. Thompson, that must first be examined. Scott was brought in to defend, after the institution of these proceedings, on account of a mortgage of the premises to him by one of the respondents. But it is now admitted, as well as proved, that his interest ceased before the bill was filed; and he denies, as do the rest of the parties, any collusion or combination with Daniels; and there is no witness in the case testifying to the contrary. It is proper, then, to say in the outset, that not being responsible at all, nor interested when he gave his testimony, it ought to be and is admitted. 1 Barb. Ch. 260; Murray v. Shadwell, 2 Ves. & B. 401; M'Donald v. Neilson, 2 Cow. 139. If he was interested, he could not testify for his co-defendant. 3 Johns. Ch. 612. The objections to Gilbert were, that a copy of the interrogatories was forwarded to him beforehand. But this does not render him incompetent, nor make his testimony inadmissible, as no comments accompanied them; and if they came from the respondents, the latter neither dictated nor wrote the answers, nor used any influence to shape them into any particular form. The letter to Thompson also merely requested him to tell the truth, without any suggestion as to what the writer of it considered to be the truth. The evidence of all of them is then properly in the case.

. The grounds set up for relief on the merits, are, first, on account of an important mistake as to the value of the shares received in payment for the farm by the complainant; and secondly, on account of fraud, false representation and imposition by the respondents in making the exchange of the shares for the farm. In respect to the first ground, I do not think it tenable on the facts of the case here, though it is often a good ground for interfering when

well supported. See cases in 3 Cow. 537; 14 Ves. 288; 2 Ves. Sr. 627; Roosevelt v. Dale, 2 Cow. 129; Daniel v. Mitchell [Case No. 3,562]. I doubt its validity here, because, great as was the acknowledged difference between the real value of the shares and that supposed by the complainant when he took them, being as some of the witnesses testify, from nothing to a par value; yet he had means of avoiding much of the mistake, if there had not been falsehood and fraud. He was referred to the officers of the company, and to a personal examination of the property of the company, and allowed time for the purpose of full inquiry, and actually did consult the officers, as far as he deemed it useful to consult them. He relied then rather on the means pointed out and used by himself to get information as to most matters, than on the statements alone of the parties; and in such cases, generally, if a mistake as to a material fact occurs without any fraud or falsehood on the part of the respondent, no relief can be granted on account of the mistake alone. Daniel v. Mitchell [supra]; Hough v. Richardson [Case No. 6,722]; and Attwood v. Small, 6 Clark & F. 523, note; Moffat v. Winslow, 7 Paige, 124. It is true that the facts, connected with his examination into the matter tend strongly to sustain the idea that the difference between the real and pretended value of the shares, in the rash and speculating mania of the times in 1836, could not then be detected by anybody so easily as now. Beside the times being so "out of joint," a mistake in the value, however great, could with difficulty, even after a very full scrutiny, have become manifest to one, who, like the complainant, seemed so infatuated and so bent on cheating himself. Under the general delusion which then prevailed, and the plausible mode adopted by the respondents to make the complainant seem rather to go forward than they, he acted on that occasion with what seems now an apparent determination to be duped, which would almost justify placing him under guardianship. Such circumstances rendered a mistake almost inevitable. But it is still doubtful whether it is remediable, when the means of judging were so opened to him, if no deception had been practised upon him, no concealments, exaggerations and falsehoods, which he had not the means to detect readily, nor the keenness to suspect or expose, and hence became their victim.

This brings us to the second ground for relief—fraud or imposition. In order to sustain that, the whole circumstances of the case, as well as the positive testimony and the character and relations of the parties, are all proper subjects of consideration. Courts of equity can go more on what is called "presumptive evidence," than those of law. 1 Story, Eq. Jur. § 190; Roosevelt v. Dale, 2 Cow. 129; Neville v. Wilkinson, 1 Brown. Ch. 543, 546. After examining all the facts in the general aspect, and then in detail, if the conclusion follows clearly that the complainant has been overreached, and that in some material degree,

by impositions or concealments, or misrepresentations, by the respondents, on which he properly relied, he ought to be relieved. 1 Story, Eq. Jur. §§ 192, 222; 7 Paige, 124; Colt v. Woollaston, 2 P. Wms. 154; Blain v. Agar, 1 Sim. 37, 45, 2 Sim. 289; 1 Schoales & L. 429. Nothing should in that event prevent relief, but great and unexplained delay in seeking it, or an adequate and ample remedy at law, or a condition of the property in controversy, which renders it impracticable for the court on any sound principle to grant redress.

The great feature of the whole · case is, that the complainant, in 1836, from being a wealthy and prosperous farmer, is stripped of the whole by the respondents, through the transaction complained of. There does not seem to have been in him the imbecility of mind which, though not idiocy, makes one liable to imposition, and calls aloud for the aid of a court of equity. Story, Eq. Jur. §§ 237, 238; Willis v. Jernegan, 2 Atk. 251; Huguenin v. Baseley, 14 Ves. 273, 290. Nor does he appear to have been a man rash in character, or inexperienced in business; and the difficulty in the outset, under these facts, is to find any reason for this catastrophe, except in some fraud practised upon him in making the contract. Many circumstances in the transaction, whose truth is admitted, were calculated to mislead a common observer, such as the first interview seeming to be accidental, and not apparently sought by Daniels and Fales; such likewise as their referring him to the officers of the company for full information, and not hurrying the bargain; such as the reluctance of Daniels to exchange his stock for the farm at so high a price; and the respectability of the president and treasurer and the agent at Durham, and the geologist who certified; with the large number of persons employed, and the important contracts said to be negotiating, or made, by a company apparently authorized by law and duly organized, and with so much capital represented to have been fairly paid in. But, amidst all this plausible exterior, it was a fact that the person introducing him to Daniels and Fales was a brother-in-law of one of them; and that the brother of that person was an owner of some of the stock, as is disclosed since his death. Yet neither of these circumstances appear to have been known to Warner. That the company was incorporated so as to appear larger and more imposing than it really was, by including in the charter several persons, not original purchasers of the quarry, nor owners of any of its stock; that it was organized, if at all, by those original purchasers; and its stock at first appears to have been entirely theirs, rather than belonging to others in some considerable amount at that time. That it thus converted the apparent sale of the quarry for $53.000 to others, merely into a real sale to themselves alone,—at first in a corporate capacity, by themselves in an individual capacity, and, in this way,

they charged other stockholders who should afterwards buy in, the enormous difference between that sum and the seven or eight thousand dollars only, which was the original cost of the whole and the improvements. That, beside some of this being not disclosed fully to Warner, so far as any evidence is put in, the president and secretary were not proprietors of the stock originally, nor acquainted intimately with its concerns, nor was the agent, Bates; and the former had been induced to officiate in their stations under flattering assurances, which all failed, and for stock chiefly given to them for services, and which peculiar situation of theirs tended directly to mislead those confiding in their general respectability and judgment, as members and purchasers of stock in the ordinary manner. That, instead of a large amount of capital having ever been paid in with money, as was represented, the treasurer swears he never received in that way over one hundred dollars; and, from the exhibits in the case, not over a thousand was probably at any time so paid; an important fact, unknown to Warner, for aught which appears, and contrary to the distinct averments in Fales' answer. That the original proprietors of the quarry, as members of the company, or creditors of it, were still interested in all the stock, except two hundred and thirty shares, out of two thousand of the old emission, and two hundred and forty out of eight thousand of the new emission, instead of the new owners being numerous, and to a large amount, as Warner probably supposed; that inquiries of officers, who owned nothing, or only a few shares given to them for their services, and knew little about the company, were not likely to be very useful, but rather to mislead, as their information must have been chiefly obtained from parties deeply interested to make sales; that the geologist who reported on the quarry, did so before it had been much opened or worked, and had been induced by Fales to leave out the important facts of there being much more granite in the immediate neighborhood of this; and that every owner of the stock, and especially the original purchasers of the quarry, among whom was Fales, had a strong motive and interest, to the extent in all of near $50.000, in getting new owners of shares.

It is further manifest, that Daniels' representation of a number of persons in Newport having bought into the company, and which he admits he made, and which was calculated to have much influence on a purchaser, was unfounded. It is not supported by any proof; and the statements by him and Fales, as to the company being duly organized, which goes to the essence of the validity of the shares, and of the purchase of the quarry, and is denied in the bill, do not appear to be sustained from the records.—the evidence proper for that purpose, in an issue like this, though they are by the oath of one of its officers, who aided to organize it. All this

evidence on record, if existing, is in possession of the respondents, and is the best and suitable evidence of such a fact. Denning v. Roome, 6 Wend. 651, 656; Owings v. Speed, 5 Wheat. [18 U. S.] 420. It is also the suitable evidence to prove not only the organization, but the authority to buy the quarry, and execute the notes, issue the shares, and other material proceedings of the corporation. Rex v. Mothersell, 1 Strange, 93. This, and not the incompetency of the owners of the quarry to pass a title to a corporation, if duly organized and composed, chiefly or only of themselves as members, is the ground on which this part of the case is very defective, and leads to a strong presumption that radical objections exist to the regularity of the proceedings of the company in these important matters. It is charged in the bill, that the company was fictitious, and hence this point becomes material. But I should hesitate to decide the case on this objection alone, as the error may be one that could be removed by further evidence, and may have happened from an impression that it was the duty of the complainant to put in the record, or that the oath of the clerk was sufficient evidence to show the original organization, and the charter and acts done under it, as may suffice under different issues, and when the question is an incidental one. 3 Metc. (Mass.) 133; Id. 282; 7 Metc. (Mass.) 592.

But, finally, it is manifest, further, that several misrepresentations very material, and calculated to mislead Warner, were made by both of the respondents. Thus, the statements which are admitted to have been made by both Daniels and Fales of the successful operations, then going on, viz., on the 19th of November, 1836, under the agent, Bates, and of the valuable contract which had been made, and was fulfilling at Portsmouth, and which were calculated to be very influential with Warner, or any other purchaser, and to be much relied on by them, as it was testing by experiment what was before theoretical as to the goodness and value of the quarry, were utterly unfounded, and known to be so to Fales, if not to Daniels. These were assurances not only relied on probably, but were material, distinct, not vague, and such as were proper to be relied on. Trower v. Newcome, 3 Mer. 704; Scott v. Hanson, 1 Sim. 13. They were the most important representations, next to the legal existence or continuance of the company itself, which could be made; and by Fales' own letter of October 5, to the agent at Durham, as well as by the agent's testimony, they were, not only then, on the 19th of November, known to be false, by Fales: but Fales, as early as the 5th of October, urged the agent to keep the truth concealed from the public, lest it might injure the value of the property. On this account Warner had not the means of detecting the groundlessness of those misrepresentations. The agent left Durham entirely, about the 1st of November, and went to New York for the company; and he left their employment the last of November. Daniels joined with Fales, or was principal, in all these last unfounded assertions, calculated to deceive Warner in most important particulars. He had opportunities to know, and must be presumed to know, if this be necessary to charge him, that some of them were entirely groundless, and especially that one, made by him alone, concerning a large number of persons at Newport having bought into the company. These, then, vitiate the transaction as representations untrue, on material points; and, if untrue by mistake, still vitiating as much by such a mistake in material matters as if there was a fraudulent design. Daniel v. Mitchell [Case No. 3,562]. So it is the better opinion, that whether Daniels himself knew these accounts to be false or not, is immaterial, if they were false and influential. 1 Story, Eq. Jur. § 193; Ainslie v. Medlycott, 9 Ves. 13, 21; Graves v. White, Freem. 57; Pearson v. Morgan, 2 Brown, Ch. 388; Shackelford v. Hendley, 1 A. K. Marsh. 500. So if Daniels himself had not made some of these false representations, but was present when Fales made them, and was benefited by them, it vitiates the transaction. McMeekin v. Edmonds, 1 Hill, Eq. 288, 293; 1 Grant, Ch. 267. He adopts the contract, and these were a part of it—some of the res gestæ. He cannot take part and repudiate part, when the other contractor acts on the whole. The Portsmouth contract with the government, which Daniels admits he stated to Warner, in exhibiting the extent of their business and prospects, on November 19th, had also been obliged to be abandoned or transferred, at a loss of five hundred dollars, as early as October, from the unfitness of the stone to fulfil it. But this last fact seems to have been entirely concealed or suppressed; and suppressio veri is as bad as suggestio falsi; and it here related to a particular highly important in respect to the prospective value of the shares and the quarry. It was a fact, likewise, more within his own knowledge, and which it was his duty to disclose. Story, Eq. Jur. §§ 147, 197; 2 Kent, Comm. 484.

The agent employed, Colonel Bates, whose character is admitted to have been high, and to commend any business in which he was engaged, was spoken of to Warner, and his high salary as an evidence of the extent of their business; but the important facts were suppressed, not only that he had reported against the goodness of the quarry, but their inability, on that account, to fulfil the Portsmouth contract, and their failure to supply him his own salary, or with means for working the quarry further. So Dr. Jackson's report was printed and distributed, and a copy delivered to Warner; but the fact concealed that Fales had requested him to strike out what was said of other granite quarries near. These were extensive, and that fact, if known, would of course tend to diminish the value of theirs. It is difficult, also, to see why Daniels should be so anxious to sell more of his stock to Whiting, as well as pay Warner only in this stock, if, as he represented, it was at par value in Boston; if the

quarry was likely to yield a dividend in the spring, of seven per cent., if it was the best stock in the market, or if it was worth dollar for dollar; all of which considerations he urged on Whiting, in November, 1836, when Warner was present. His declarations about a week after, in trying to sell a note to Whiting, against the company, were of a like character, and hardly to be explained on any honest hypothesis. For he averred, that the company "would cash a demand against them at any time;" when, if true, why was he so anxious to sell the note? And why had Bates, the agent, been obliged to stop work in part for want of funds? And why had not the five hundred dollars been paid for the loss on the Portsmouth contract? And why had not the numerous other debts, and especially the original mortgage, been paid? And, if true, how were the means obtained, when only from one hundred or one thousand dollars, to the utmost, had ever been paid in by the stockholders? This last talk with Whiting is competent evidence (Bradley v. Chase, 22 Me. 511), being on a subject of a kindred character, near the time of the transaction in question, and illustrating his intention. Wood v. U. S., 16 Pet. [41 U. S.] 342, 360; [U. S. v. Wood] 14 Pet. [39 U. S.] 430; 1 Starkie, Ev. 64; 2 Starkie, Ev. 220; 1 Phil. Ev. (Cow. Ed.) 179; 2 Id. 452, 463; 4 Bos. & P. 92; 7 Bing. 543. The entire worthlessness of the shares soon became apparent to those officers who had been duped, as well as to several others. The whole estate, including the quarry, which had been mortgaged, was foreclosed, and went merely to pay the balance of the small amount of the original purchase-money. The tools, stone, &c., remaining, were attached to secure other debts; and the original purchasers of the quarry, having most of the stock of their corporation left on their own hands, became bankrupts, like Fales. Instead of $40,000 having been paid in on the shares, as Daniels alleges, the only receipts in money satisfactorily proved, were only from a hundred to a thousand dollars, but a drop in the bucket to their expenses; and the company thus, for aught which appears, ceased to have legal existence, or credit, or property, and exploded, as one of the worst among the thousand bubbles in the speculating mania of that period. Often an entire failure of consideration in the receipt of what is mere moonshine, is sufficient to rescind a contract. Terry v. Breck, 1 Grant, Ch. 367; Chesterfield v. Janssen, 2 Ves. Sr. 155; Dyer v. Rich, 1 Metc. (Mass.) 180, 192. It shocks the conscience on the face of the transaction, and is sometimes plenary evidence of fraud. But mere inadequacy of consideration may honestly occur, and often raises no certain presumption of deceit (1 Story, Eq. Jur. §§ 244–246), as the difference may be small, or, if large, occurring from other causes than fraud, and more especially is this the case in speculating times like those of 1836 (Blachford v. Christian, 1 Knapp, 73, 77; 1 Brown, Ch. 558, 560. It is not, per se, fraud. Griffith v. Spratley, 1 Cox, Ch. 383; Low v. Barchard, 8 Ves. 133; 3 Ves. & B. 180).

To charge such a loss on an innocent purchaser of its shares, rather than on its projectors and early owners, would seem inequitable, if the contract had not been carried into effect; but even after that, if it turns out to have been carried into effect by fraudulent representations and falsehoods, on points very material (Smith v. Richards, 13 Pet. [38 U. S.] 26, 37), it would be derogatory to courts of equity and justice, if they could not, and did not lend relief. Attwood v. Small, 6 Clark & F. 232; 2 Ridg. App. 397; Jackson v. Ashton, 11 Pet. [36 U. S.] 229; Osgood v. Franklin, 2 Johns. Ch. 1, 23; White v. Damon, 7 Ves. 30; 18 Ves. 335.

The points here, where misrepresentation occurred, were manifestly material, as they should be, to present a ground for our interference. Phillips v. Duke of Bucks, 1 Vern. 227. Nor is this a case of clear and sufficient redress at law. The aid of a court of chancery was indispensable to obtain the discovery of most of the important facts in the case; and hence an application for relief here can well be sustained on, and in connection with that discovery, notwithstanding the 16th section of the judiciary act of the United States, requiring us to refuse aid in chancery when it can be obtained as fully at law.

I do not find it necessary to consider several other matters, pressed at the hearing, or if not pressed, disclosed in the pleadings and evidence. These, to which I have referred, rest on facts admitted, or clearly proved for the complainant, and not disproved on the part of the respondents by proper evidence. These also give the case a direction that seems to accord with the broad face of the whole transaction. They will work no injustice to any one, as the result will be merely to place the parties in statu quo, as they stood before November 19th, A. D. 1836.

The only remaining objection is the length of time that has since elapsed. But it appears that steps have been taken to obtain this relief, since 1840. That the complainant was induced to believe for some years that the revulsions in the times were the cause of the works not going on; that till about 1840 he was not aware he possessed a remedy in chancery; and that the shares and the farm have not been affected by the delay since, so as to render a rescinding of the contract either impracticable or inconvenient. The value of neither appears to have materially changed since, which when happening, sometimes constitutes an objection. McNeil v. Magee [Case No. 8,915]; [Pratt v. Carroll], 8 Cranch [12 U. S.] 471; 8 Clark & F. 650. Length of time unexplained may sometimes be a bar short of the statute of limitations; but if fraud exists, or the delay is accounted for, it is no bar. See 2 Schoales & L. 629; 17 Ves. 99; 7 Johns. Ch. 90; Ang. Lim.; Hough v. Richardson, before referred to, and Vigers v. Pike, 8 Clark & F. 562; Sanborn v. Stetson [Case No. 12,291]; [Bowman v. Wathen], 1 How. [42 U. S.] 192. So it will not be a bar by analogy to

the statute, as to length of time, if such a course would work injustice. 1 Story, Eq. Jur. § 64a; 1 Johns. Ch. 316; 2 Ves. Jr. 571; 1 Atk. 493; 10 Ves. 466, 467; 12 Ves. 266, 374; 1 Ves. Jr. 374; 14 Ves. 91; Cooper, Ch. 204; 20 Johns. 58, &c.

If either party cannot restore the property in good condition, that may be good ground for not rescinding; but, at the same time, damages can be and should be given instead of rescinding, if necessary to enforce what is just, and the case is properly in chancery. Thus, if the inability to restore happens by the course of the complainant, it should not prejudice him in getting some kind of relief, if he was not then aware of the fraud. 3 Litt. (Ky.) 365. But if damages alone are sought, and alone can be given, and the fraud related to personal property, the relief is usually at law. Russell v. Clark, 7 Cranch [11 U. S.] 84. Though some cases hold otherwise, even there. Evans v. Bicknell, 6 Ves. 182; Bacon v. Bronson, 7 Johns. Ch. 194, 201; 1 Story, Eq. Jur. § 184, etc. But it could not be held otherwise in the United States courts, under the clause in the judiciary act before referred to, if the remedy at law be complete, since then, it is provided, resort shall be had to law, rather than equity.

In cases of fraud in the sale of real estate, as here, when a court of equity can set aside the sale, and a court of law cannot, the jurisdiction of the former is usually held to be clear. 1 Bibb, 244; 1 Story, Eq. Jur. § 184 et seq.; 2 Story, Eq. Jur. §§ 798, 799, et seq.; Hepburn v. Dunlop, 1 Wheat. [14 U. S.] 197. So the jurisdiction in equity is clear, where a discovery is sought as here. Gaines v. Chew, 2 How. [43 U. S.] 619. In relation to the sale in this case, then, let it be rescinded, and the shares conveyed by Warner to Daniels, and the farm by Daniels to Warner, and a master be appointed to report the amount of rents and waste (after deducting permanent improvements) that, in the mean time, should be allowed to Warner by Daniels. 1 Bibb, 244; Daniel v. Mitchell [supra].

It appears, I think, from the printed case, that when it was made up, Daniels still owned, and was in a situation to reconvey, the farm, and that Warner, though the shares stood in his son's name as owner, still probably could control and reconvey them. Should such still be the case, it can be closed, as just directed, without any complexity, or resort to any estimate of damages, on the master's reporting. But if the condition of either party should be materially altered in this respect, it will be proper to provide for it, if the power and right to do so exist in this court. Some cases hold, that if either party, pending the proceedings, sells the property, so that he cannot reconvey, damages alone should be given, though not in other cases. Todd v. Gee, 17 Ves. 273; Denton v. Stewart, 1 Cox. Ch. 258. But some authorities hold, that in all cases, where the jurisdiction in equity has once attached clearly to the case, damages alone may be given, when-

ever reasonable, and may be estimated, either by a master in chancery, or on an issue quantum damnificatus to a jury. See cases cited in 2 Story, Eq. Jur. §§ 794–799; [Pratt v. Law] 9 Cranch [13 U. S.] 493; 1 P. Wms. 570; 4 Ves. 497; 3 Atk. 512.

If, contrary to expectation, then, neither the land nor the shares can be reconveyed, the master can hereafter examine and report the damages done to Warner by the misrepresentations of Daniels and Fales, and a decree be entered against them for the amount. If the farm can be reconveyed, and not the shares, the former can be done, and the net income ascertained and paid as before directed,—the value of the shares, if any thing, in December, 1836, and interest since being reported by a master, and deducted therefrom. In rescinding a contract, it seems reasonable to adopt a rule like that in enforcing a specific performance, which is, to go as far as you can, pro tanto, and give proportionate damages for the residue. 2 Story, Eq. Jur. § 779; McKay v. Carrington [Case No. 8,841]; 1 Fonb. Eq. bk. 1, c. 1, § 8; [Hepburn v. Dunlop] 1 Wheat. [14 U. S.] 197; Paton v. Rogers, 1 Ves. & B. 351. Should the facts, therefore, require more than what has first been proposed by mutual reconveyances, I am prepared to go further according to what seems to me to be sound principle, sustained by several precedents, in addition to what has already been cited.

The parties in this case come here for discovery and relief, and have obtained the former, when it could not be had in a court of law; and, in order to make the redress perfect, if third persons have since become interested in the property, so that the fraudulent sale cannot be set aside, and a reconveyance made of the whole, the relief for damages becomes necessary and proper, either in part or in full. A court of equity may relieve as to part of land or contract, if the fraud does not reach the whole. It will go to the extent of the injury. Dunlap v. Stetson [Case No. 4,-164]. Thus in Pratt v. Law, 9 Cranch [13 U. S.] 494, in a bill in equity, where a contract has been partly performed, and the rest, that is, other lots, cannot be conveyed specifically, because sold, &c., the court can make an issue quantum damnificatus, and decree the amount, or, without it, make the party pay the ratio of the price given for all, which the deficiency of lots bears to all. So in Woodcock v. Bennet, 1 Cow. 711, in a prayer for a specific performance, it was held that the court may refer it to a master to assess the damages, and not dismiss the bill, because they cannot enforce a specific performance, the land having been conveyed away. 1 Fonb. Eq. 38, in y, and 165, in b; 3 Atk. 512–517; 1 P. Wms. 570; Colt v. Nettervill, 2 P. Wms. 304; Denton v. Stewart, 1 Cox, Ch. 258; Greenaway v. Adams, 12 Ves. 401.

The bill, then, must be dismissed as to E. Fales and Scott, and a final decree entered against Joseph Fales and Daniels, on the principles above set out, and with costs.